# MEMORANDUM OF LAW

FILED

DEC - 1 2025

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
_____ DEP CLK

## INTRODUCTION

This case involves a uniquely straightforward series of constitutional violations. This motion is based on Defendants' bodycam footage, Plaintiff's Seicane dashcam footage, and documentary evidence that creates an unambiguous record.

This case began when Plaintiff observed Corporal Guy Caine's patrol vehicle rapidly accelerating towards Plaintiff, at which time Plaintiff was walking across West Third Street. (Pl's SUMF 1-5). Plaintiff engaged in an act of remonstration in response to this reckless disregard for Plaintiffs' safety. Plaintiff's refusal to accept Defendant Estes' excuse of "blue lights" caused Defendant Estes to then chill Plaintiff's First Amendment protected speech, by threatening Plaintiff with arrest, for Plaintiff's act of saying "fuck," and subsequently arresting Plaintiff for saying the word "hell" while disengaging from Defendant Estes. (Pl's SUMF 6, 8). Defendant Estes acted well outside the bounds of his authority, by aggressively approaching Plaintiff from the rear, initiating a seizure of Plaintiff's person—based solely on this protected speech, without probable cause, reasonable suspicion or even so much as a hunch. (Pl's SUMF 7-11). The arrest, which caused Plaintiff to sustain minor injuries (Pl's SUMF 29), was retaliation for Plaintiff engaging in an act of remonstration, and involved a sequence of retaliatory civil rights violations—retroactively justified by a fabricated claim of Plaintiff being near a "large crowd" at a "block party"; specifically Defendant Estes swore that Plaintiff's speech occurred "in front of a large crowd of people," and obtained a magistrate's order for Disorderly Conduct under N.C.G.S. §14-288.4 and Resisting an officer under §14-223. (Pl's SUMF 25). Defendant Estes authored an incident report that alleges Plaintiff was arrested "in front of a large crowd of people at a block party while standing in the middle of W. Third St." (Pl's SUMF 26). The bodycam footage conclusively proves this is demonstrably false. Defendants Estes and Cash parked their vehicles

1

at the intersection of Chestnut and West Third Street with the intent to respond to a separate gathering approximately 500 feet away, at 407 Chestnut Street. (App. 8; App. 9). Defendants got out of their patrol vehicles and began walking toward that distant gathering; Defendants then encountered and arrested Plaintiff. The arrest occurred at this initial location, before they had an opportunity to approach the crowd, which was approximately 500 feet away from the intersection of West Third Street and Chestnut Street, where Plaintiff and Defendants were located.

Furthermore, the record demonstrates First and Fourth Amendment violations by Defendants Estes and Cash, including malicious prosecution, a complete failure to intervene by Defendant Cash during both the unlawful seizure and the subsequent deliberate indifference to Plaintiff's serious medical needs. (Pl's SUMF 9-19). The record also shows a pattern of ratification and deliberate indifference to the rights of citizens from the final policymaker, Defendant Davis. This is evidenced in part by the promotion of Defendants after an unlawful arrest, while a formal complaint detailing corruption and civil rights violations, which alleged the very falsification of evidence now shown by the record, went uncorrected. (Pl's SUMF 30-37).

Defendants have failed to provide any factual contentions or narrative testimony regarding the events of July 7, 2024, but only offer that "Plaintiff's behavior rose to the level of disorderly conduct, as defined by North Carolina statutes," and rely solely on the bodycam footage for their version of events. (App. 15 pp. 3 ¶ 6, 5 ¶ 8, 6 ¶ 2). Plaintiff contends that the bodycam videos themselves confirm Plaintiff's account, and no contradictory evidence has been submitted. The Court need only view the record to conclude that Defendants violated Plaintiff's clearly established rights.

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

Plaintiff incorporates by reference and files concurrently herewith his Statement of Undisputed Material Facts, which sets forth, with specific citations to the record, the facts that are not subject to genuine dispute.

I. **Standard of Review**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment will not lie if the dispute about a material fact is 'genuine', that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). As the Court has observed, "it is true that the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial. 391 U.S., at 288-289." *Id.* at 248-249 (citing *Bank of Arizona* v. *Cities Service Co.*, 391 U.S. 253 (1968). Furthermore, "the adverse party 'must set forth, specific facts showing that there is a genuine issue for trial." *Id.* at 250. "The party opposing the motion for summary judgement bears the burden of responding *only* after the moving party has met its burden of coming forward with proof of the absence of any genuine issues of material fact.' 244 U.S. App. D. C. at 163, 756 F.2d, at 184 (emphasis in original; footnote omitted)" *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 321 (1986) (quoting *Adickes* v. *S. H. Kress & Co.*, 398 U.S. 144, 159 (1970)). The facts deduced from the offered evidence, "must be viewed in the light most favorable to the party opposing" summary judgment." *United States* v. *Diebold Incorporated*, 369 U.S. 654, 655 (1962).

II.     **Argument and Authorities**

The central dispute in this case begins with the words Plaintiff uttered that drew Defendant Estes's disdain. The arrest was predicated on this speech, which is protected by the First Amendment. The First Amendment's protection extends to the entirety of Plaintiff's verbal criticism, all of which fails to meet the high bar for unprotected speech.

A. **The First Words Plaintiff Spoke Were Protected Under the First Amendment**

Plaintiff's initial statements of—"what the fuck is this officer's problem," and saying "this is bullshit," are the epitome of criticism that the First Amendment shields. (Pl's SUMF 1-4). This speech formed the basis for the subsequent commands and seizure.

1. **Applicable Law**

Plaintiff was charged with violation of N.C.G.S. §14-288.4, which states that a person cannot "make or use any utterance, or gesture display or abusive language which is intended and plainly likely to provoke a violent retaliation and thereby cause a breach of the peace." N.C.G.S. §14-288.4. The Court recognized that "fighting" words are "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky* v. *New Hampshire*, 315 U.S. 568, 572 (1942) (citing Chafee, *Free Speech in the United States* (1941), 149.). "The Court has explained that the 'small class' of 'fighting words' is limited to 'direct personal insults'—statements clearly 'directed to the person of the hearer,' who is 'actually or likely to be present.' *Johnson*, 491 U.S. at 409, 109 S.Ct. 2533; *Cohen*, 403 U.S. at 20, 91 S.Ct. 1780 (quoting *Cantwell*, 310 U.S. at 309, 60 S.Ct. 900). Without evidence of a direct personal insult, the Court has determined that the government may not obtain a conviction for 'fighting words.' *Id.*" *United States* v. *Bartow*, 997 F.3d 203, 207 (4th Cir. 2021). This puts a very high bar on

4

what speech can constitute a violation of the aforementioned statute, as it specifically states that the comments must be "intended" to "provoke a violent retaliation." N.C.G.S. §14-288.4.

"The freedom of individuals to verbally oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston* v. *Hill*, 482 U.S. 451, 462-463 (1987) (citing *The King* v. *Cook*, 11 Can. Crim. Cas. Ann. 32, 33 (B. C. County Ct. 1906; *Levy* v. *Edwards*, 1 Car. & P 40, 171 Eng. Re. 1094 (Nisi Prius 1823)). The Court has invalidated statutes that make it a crime "to curse or revile or use obscene or opprobrious language toward or with reference to any member of the city police while in the actual performance of his duty." *Lewis* v. *City of New Orleans*, 415, U.S. 130, 132 (1974).

2. **Application of Law to the Facts**

Defendants have been reluctant or unable to point to the words Plaintiff specifically used that constitute Disorderly Conduct under N.C.G.S. §14-288.4. Defendants also provide no specific narrative or justification for the actions that gave rise to this claim, and make a blanket assertion that Plaintiff's words "rose to the level of disorderly conduct," with no specificity. (App. 15, p. 6 ¶ 2). This is not the standard as Defendants must show "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. The Court has warned of the exact type of situation at issue in this case, stating, "[t]he opportunity for abuse, especially where a statute has received a virtually open-ended interpretation, is self-evident." *Hill*, 482 U.S. at 480 (quoting *Lewis* v. *City of New Orleans*, *supra*, at 135-136 (POWELL, J., concurring in result)).

Defendants are essentially relying on their own "open-ended interpretation" of what is and isn't Disorderly conduct, based on arbitrary measures and not "fighting words." *Lewis*, 415, U.S. at 135-136 (POWELL, J., concurring in result). Because Defendants offer no specific facts,

Plaintiff can only assume that Plaintiff's use of the word "hell" was what triggered Plaintiff's arrest, as Plaintiff said "fuck" when initially arguing with Defendant Estes seconds prior and was told not to curse, to which Plaintiff *did not curse* or say "fuck" again, but was *still* seized by Defendant Estes. (Pl's SUMF 6-11).

3. **Conclusion**

Plaintiff's reluctance to submit in the face of Defendant Estes' chilling of Plaintiff's speech, falls within the rule in *Hill. City of Houston* v. *Hill*, 482 U.S. 451 (1987). Its to be noted that Plaintiff was simply remonstrating against what Plaintiff viewed as unacceptable behavior by Corporal Caine, and again against Defendant Estes by asserting "Imma say what the hell I want to say," before *disengaging* from what was, based on the fact that Plaintiff was never given commands to stop or detained by Defendant Estes, a *consensual encounter*. The principle established in *Hill*, controls the outcome here. *Id.*

In reality, Defendant Estes unlawfully arrested Plaintiff, based on Plaintiff's unwavering demeanor of criticism towards Corporal Caine's reckless driving and Defendant Estes' subsequent chilling of Plaintiffs Speech (Pl's SUMF 1-11). By arresting Plaintiff, Defendant Estes chose to abandon the "constitutional requirement that, in the face of verbal challenges to police action, officers and municipalities must respond with restraint." *Hill*, 482 U.S. at 471. Also notably, Plaintiff's speech falls specifically within the rule outlined in *Lewis*, and is clearly established as being lawful. *Lewis* v. *City of New Orleans*, 415 U.S. 130 (1974).

B. **Plaintiff's Use of the Word "Nigga" In This Situation is Protected**

As Defendant Estes' bodycam activates, Plaintiff can be heard responding to Defendant Estes, "Nahh nahh nahh this nigga just rode down the wr—." (Pl's SUMF 5). This phrase in this situation is protected under the First Amendment. This is true under two alternative interpretations, either of which is fatal to the Defendants' position.

1. **Applicable Law**

   a. As a threshold matter, Plaintiff's use of the word "nigga" was not a racial insult. It was used in a neutral, colloquial sense, synonymous with "guy," "dude," or "person," *while describing* Corporal Caine's dangerous driving. This word was included in a statement of observational fact and criticism, not a derogatory personal attack. On this basis alone, Plaintiff's speech is protected.

   b. The North Carolina Supreme Court has recognized that "no fact is more generally known than that a white man who calls a black man a 'nigger' within his hearing will hurt and anger the black man and often provoke him to confront the white man and retaliate." *In re Spivey*, 480 S.E. 2d 693, 699 (1997). That is not the case here, as Plaintiff is a 38 year old Black male; Defendant Estes is White. "The circumstances in which the word is used matter a great deal." *Bartow*, 997 F.3d at 209 (internal quotation marks omitted). The word also must be "directed to the person of the hearer." *Id.* at 207. This contextual use as a racial slur, constitutes words that are "plainly and likely to provoke violent retaliation," which would realistically "cause a breach of the peace." N.C.G.S. §14-288.4 (a)(2).

7

2. **Application of the Law to the Facts**

Here, the circumstances fail both prongs of this test, even under the assumption that Plaintiff's use of the word "nigga" was derogatory:

    a. **Not a Direct Personal Insult to Anyone Present**: The word was used during commentary on a public safety hazard—a vehicle being driven dangerously towards Plaintiff and Defendant Estes. (Pl's SUMF 1-5). It was not a "direct personal insult" aimed at Estes or any other Deputy. *Bartow*, 997 F.3d., at 207.

    b. **Not Directed at the Hearer**: The statement was not directed at Defendant Estes. It was used in the course of critiquing a third party, Corporal Caine, who was driving towards Plaintiff and Defendant Estes, and was not the "hearer" of the statement. *Id.* Estes was a bystander to this criticism, not its target. Corporal Caine was approaching Plaintiff and Defendant Estes in his patrol vehicle, and could not hear Plaintiff's use of this word. (Pl's SUMF 1-5).

3. **Conclusion**

The circumstances here are that Plaintiff was criticizing a government official's dangerous conduct as it was happening towards Plaintiff—not engaging in a face-to-face confrontation with Corporal Caine. Therefore, whether the speech is viewed as neutral commentary or as a derogatory term, the Government cannot prove it was a "direct personal insult" made toward any present "hearer." *Bartow*, 997 F.3d at 207. This word objectively does not constitute probable cause for an arrest in this situation. Even if the Court were to interpret the word itself as derogatory, Defendants cannot satisfy the legal standard required to strip it of First Amendment protection. This is precisely the kind of context where this word would fall under the protection of the First Amendment.

C    **Plaintiff's Subsequent Speech was Protected Under the First Amendment**

Plaintiff asked, "aye bro what the fuck is you doing," as Corporal Caine's patrol vehicle traveled past Plaintiff and Defendant Estes before parking, asserting to Defendant Estes, "I don't give a fuck, you don't roll down the wrong—" and affirming, "Imma say what the hell I want to say" (Pl's SUMF 5-8) are all unquestionably utterances that fall under the protection of the First Amendment.

1. **Applicable Law**

The Supreme Court's fighting words doctrine is narrowly confined to a "small class" of speech, which includes "direct personal insults." *Bartow*, 997 F.3d., at 207. "Speech is often provocative and challenging….[But it] is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above inconvenience, annoyance , or unrest." *Hill*, 482 U.S. at 461 (quoting *Terminiello* v. *Chicago*, 337 U.S. 1, 4 (1949)). In *Hill*, the Supreme Court cited Justice Powell, J.'s concurring opinion in *Lewis*, in recognizing that "a properly trained officer may reasonably be expected to 'exercise a higher degree of restraint' than the average citizen, and thus less likely to respond belligerently to 'fighting words.' 415 U.S., at 135 (citation omitted)." *Id*. at 462.

2. **Application of Law to the Facts.**

Defendants contending that Plaintiff's words rose to the level of Disorderly Conduct (App. 15, p. 6 ¶ 2). Defendant Estes warned Plaintiff not to "curse," yet proceeded to arrest Plaintiff *only* after Plaintiff used the word "hell," a term that is neither profane nor constitutionally unprotected. (Pl's SUMF 7-11). There was nothing in Plaintiff's language that presented a "danger" or "serious substantive evil." *Hill*, 482 U.S. at 461. Nothing in the encounter suggested that Plaintiff intended to provoke violence, nor could any reasonable officer

believe that *walking away* while using the word "hell," especially after Plaintiff had earlier used stronger language without consequence, rose to the level of "fighting words." *Chaplinsky*, 315 U.S. at 573. The undisputed facts show that Plaintiff's arrest was based solely on protected speech. (Pl's SUMF 1-16). Defendant Estes exercised *less* restraint than an average person on July 7, 2024. In the current case, Plaintiff's words simply cannot be characterized as intended to provoke Defendant Estes to a breach of the peace. Such a position is judicially untenable.

### 3. Conclusion

Plaintiff's words were not a personal attack on *any* individual. They were expressions of criticism and outrage directed at a specific, dangerous act of official conduct. Such speech, even if uttered loudly and in front of a crowd, does not lose its constitutional protection. It does not qualify as incitement, constitutes no true threat, and remains a far cry from the narrow category of personal, face to face insults that define "fighting words" outlined in *Chaplinsky*, 315 U.S. at 573. Therefore, the Defendants' justification for the arrest fails under any conceivable set of facts presented by this record. Accordingly, Defendant Estes lacked the probable cause needed to legally arrest Plaintiff for Disorderly Conduct under N.C.G.S. § 14-288.4. As a result, Plaintiff's arrest was a violation of his First Amendment right and also establishes liability for a False Arrest claim.

### D. There Was No Probable Cause for the Resisting, Delaying, or Obstructing Charge.

Plaintiff was seized unlawfully from behind, and pulled his arm out of the grip of Defendant Estes. (Pl's SUMF 9-15). As a result, Plaintiff was charged with Resisting, Delaying, or Obstructing a Public Officer under N.C.G.S. § 14-223, which provides that "if any person shall willfully and unlawfully resist, delay or obstruct a public officer in discharging or attempting to discharge an official duty, the person is guilty of a Class 2 misdemeanor"

1. **Applicable Law**

First, a person cannot be convicted of resisting an officer if the underlying arrest is unlawful. "The offense of resisting arrest, both at common law and under the statute, G.S. § 14-223, presupposes a lawful arrest. It is axiomatic that every person has the right to resist an unlawful arrest. In such case the person attempting the arrest stands in the position of the wrongdoer and may be resisted by the use of force, as in self defense." *State* v. *Mobley*, 83 S.E.2d 100, 102 (N.C. 1954) (Citing *State* v. *Beal*, 170 N.C. 764, 87 S.E. 764, 87 S.E. 416; *State* v. *Allen*, 166 N.C. 265, 80 S.E. 1075; *State* v. *Belk*, 76 N.C. 10; *State* v. *Bryant*, 65 N.C. 327; *State* v. *Kirby*, 24 N.C. 201; *State* v. *Curtis*, 2 N.C. 471; 4 *Am.Jur.*, Arrest, Sec. 92; 6 *C.J.S.*, Arrest, §13, page 613. *See also* 28 *Va. Law Review*.). But the 4th Circuit has also recognized, "the right of a person to use force in resisting an illegal arrest is not unlimited. He may use only such force as reasonably appears to be necessary to prevent the unlawful restraint of his liberty." *Id*. (Citing *State* v. *Allen*, *Supra*. *See also State* v *Glenn*, 198 N.C. 79, 150 S.E. 663.)

"To establish guilt beyond a reasonable doubt, [N.C.G.S. §] 14-223 requires that the State prove a defendant acted 'willfully' when resisting, delaying, or obstructing a public officer in the discharge of his or her duties. To prove 'willfulness,' the State must introduce sufficient evidence that the defendant acted without justification or excuse, 'purposely and deliberately in violation of law.' *Peters*, 255 N.C. App. at 388, 804 S.E.2d at 816 (quoting *State* v. *Arnold*, 264 N.C. 348, 349, 141 S.E.2d 473, 474 (1965)). When used in [N.C.G.S. § 14-223], 'willful' is to be interpreted as something more than an intention to do a thing. It implies the doing [of] the act purposely and deliberately, indicating a purpose to do it without authority — careless whether [someone] has the right or not — in violation of law, and it is this which makes the criminal intent without which one cannot be brought within the meaning of a criminal statute. *Id*." *State* v.

*Humphreys*, 853 S.E.2d 789, 796-797 (2020) (interpreting 'willful' in the context of a violation of N.C.G.S. § 14-223) (quoting *State v. Moore*, 240 N.C. App. 465, 478, 770 S.E.2d 131, 141 (2015)).

### 2. **Application of the Law to the Facts**

Here, Defendant Estes was not lawfully discharging a duty of his office because the arrest for Disorderly Conduct was unlawful, as Plaintiff has demonstrated in the previous sections. Plaintiff's actions were not "willful" as required by the statute. *Id*. Defendant Estes attempted to bully Plaintiff into not speaking in remonstration of the actions that had taken place. (Pl's SUMF 1-11). Plaintiff arguing with Defendant Estes is not unlawful, and a badge does not make it so. Defendant Estes had not so much as a hunch of a suspicion that Plaintiff was engaging in criminal activity, and was in the process of violating Plaintiff's First Amendment right, in an act of First Amendment Retaliation at the time of the resistance.

### 3. **Conclusion**

Plaintiff's instinctual act of pulling his arm away when suddenly grabbed from behind without warning or a lawful command, is the opposite of a "willful" violation of the law. *Humphreys*, 853 S.E.2d at 796-797. It was a reflexive, justified act of self-preservation in response to an *unlawful* seizure, not a purposeful and deliberate attempt to obstruct an officer.

Moreover, Plaintiff was trying to "curr [his] ass down the street" as Defendant Estes commanded. (Pl's SUMF 6). Defendant Estes can not then assert that Plaintiff "took off running." (Pl's SUMF 26). Because Defendant Estes arrested Plaintiff *unlawfully*, and Plaintiff's resistance was not "willfull" the charge for Resisting a Public Officer necessarily lacked probable cause and is a violation of Plaintiffs Fourth Amendment right.

E. **Defendants Estes and Cash are Liable for Malicious Prosecution.**

Here, the false claims of a "large crowd" at a "block party,"and Plaintiff "running," were material and necessary to the Magistrate's Order for Plaintiff's arrest. The entire justification for the Disorderly Conduct charge relied on speech creating a public disturbance, which requires more than a single officer hearing it. Defendant Estes's claim that this occurred near a "large crowd" (Pl's SUMF 25-26) was not a minor misstatement; it was a fundamental fabrication of the scene's entire context, as Plaintiff's arrest did not occur anywhere close to a crowd of people. (Pl's SUMF 1-18).

1. **Applicable Law**

The objective evidence in this case, provides the definitive record against which all claims must be judged. In evaluating claims based on falsified statements, the statements must be "material," a to decide this a Court must first, "excise the offending inaccuracies and insert any facts recklessly omitted, and then determine whether or not the 'corrected' [magistrate's order] would establish probable cause." *Miller* v. *Prince George's County*, 475 F.3d 621, 628 (4th Cir. 2007) (quoting Wilson v. Russo, 212 F. 3d 781 (3d Cir. 2000) at 789). In Plaintiff's case, this would mean that if probable cause can be established by the "corrected" Magistrate's Order, "no civil liability exists against the officer." *Id*. "A 'malicious prosecution claim under § 1983 is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort.' *Lambert* v. *Williams*, 223 F.3d 257, 261 (4th Cir. 2000). To state such a claim, a plaintiff must allege that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Evans* v. *Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) (citing *Durham* v. *Horner*, 690 F.3d 183, 188 (4th Cir. 2012). To satisfy this three prong

test, Plaintiff must show that Defendants, "knowingly and intentionally or with a reckless disregard for the truth" either made false statements" or "omitted facts" that are "necessary to a disinterested magistrate's authorization" *Id.* At 649-650 (citing *Franks* v. *Delaware*, 438 U.S. 154 (1978) at 155-156). To show favorable termination for a malicious prosecution claim, "a plaintiff need only show that the criminal prosecution ended without a conviction." *Thompson* v. *Clark*, 142 S. Ct. 1332, 1341 (2022).

## 2. **Application of Law to the Facts**

The undisputed evidence shows the "gathering" Defendant Estes cited to the magistrate and in the incident report from this Plaintiff's arrest, was a separate incident approximately 500 feet away. (Pl's SUMF 1-11; App. 1; App. 8; App. 9). Defendants parked at the intersection of Chestnut Street and West Third Street, and had just begun walking toward that distant gathering when they arrested Plaintiff at that intersection. Defendants never reached the crowd, and the arrest occurred where they parked, proving definitively that no "large gathering" was present at the scene of Plaintiff's speech or arrest, as sworn to by Defendant Estes, before Magistrate Christopher Kidd.

## 3. **Conclusion**

Without this fabricated "large crowd" surrounding Plaintiff, there was objectively no probable cause for the charge of Disorderly Conduct. Defendant Estes caused Plaintiff's seizure by initiating this legal process with a material falsehood (Pl's SUMF 1-28). Defendant Cash approved the incident report that contained this same fabrication (Pl's SUMF 28), thereby participating in the malicious prosecution on the scene, *and* approving the fabricated report, thereby committing a second offense of Malicious Prosecution.

Finally, the criminal proceedings terminated in Plaintiff's favor when the charges were dismissed with no leave. (Pl's SUMF 34). Accordingly, Defendants Estes and Cash are liable for malicious prosecution.

F.   **Defendant Cash Is Liable for Failure to Intervene under bystander liability**

Defendant Cash was present for the entire encounter, witnessed the clearly unlawful seizure and use of force, and approved of the unlawful actions taken by Defendant Estes and Corporal Caine.

Furthermore, Defendant Cash failed to intervene in the subsequent deliberate indifference to Plaintiff's serious medical needs. After Plaintiff was placed in the patrol vehicle, his repeated pleas that it was "hard to breathe" and "hot" after being placed inside the back of a purposefully hot patrol vehicle, presented an obvious, purposeful, and serious medical distress (Pl's SUMP 17-19).

1.   **Applicable Law**

The 4th Circuit has recognized that "an officer may be liable under § 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Randall* v. *Prince George's County*, 302 F.3d 188, 204 (4th Cir. 2002). In explaining the premise, the 4th Circuit recognized "the rationale underlying the bystander liability theory is that a bystanding officer, by choosing not to intervene, functionally participates in the unlawful acts and the imposition of personal liability is permissible." *Id.* This duty extends to preventing constitutional violations, including false arrests, malicious prosecution, and deliberate indifference to serious medical needs.

## 2. **Application of Law to the Facts**

Defendant Cash witnessed the unlawful arrest of Plaintiff and did not intervene to stop the unlawful conduct by Defendant Estes. Defendant Cash was also well in earshot of Plaintiff's pleas of breathing trouble—took no corrective action, choosing instead to simply walk away and join another conversation (Pl's SUMF 19; 21). This deliberate indifference to an arrest supported by no probable cause, serious medical needs served no legitimate law enforcement purpose and demonstrated a purpose to cause harm. (Pl's SUMF 19-21)

## 3. **Conclusion**

Defendant Cash had an obligation as a supervisor, to make sure that Plaintiffs arrest was supported by probable cause. That simply did not happen, and Defendant Cash actually helped to justify the illegal arrest, by approving a report that was known to contain numerous falsehoods. Defendant Cash had an opportunity to stop the unlawful arrest but choose to do nothing.

By witnessing the constitutional violations by Corporal Caine, Defendant Cash had a clear opportunity to act—by checking on Plaintiff, rolling down a window, or ordering his subordinate to start the vehicle's air conditioning; Defendant Cash chose to do nothing. His failure to intervene under these circumstances establishes his liability for these separate constitutional violations.

## G. **The Seizure and Use of Force Were Objectively Unreasonable.**

All claims that law enforcement officers have used excessive force during "the course of a seizure" are analyzed under the Fourth Amendment's objective "'reasonableness' standard." *Graham* v. *Connor*, 490 U.S. 386, 395 (1989) (citing *Tennessee* v. *Garner*, 471 U.S. 1, 7-8 (1984)). The Court must balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests," considering (1)

the "severity of the crime," (2) "whether the suspect poses an immediate threat," and (3) "whether he was actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. (citing Garner, 471 U.S. at 7-8)

Here, all factors weigh decisively in Plaintiff's favor. First, he was not suspected of any crime, let alone a severe one (Pl's SUMF 20). Second, he posed no threat; he was disengaging and walking away from Defendant Estes when he was unlawfully seized. (Pl's SUMF 6-11). Third, he was not resisting until after he was unlawfully seized (Pl's SUMF 1-11), and even then, it was not "willfully." *Humphreys*, 853 S.E.2d 796-797; *see also* (Pl's SUMF 16). The only reasonable inference that can be drawn, is that Corporal Caine turned off the vehicles ignition when he had the driver door opened, and Defendant Cash committed the deliberately indifferent act of allow a subordinate to construct the back seat of a patrol vehicle to create an ideal environment for passive indirect punishment (Pl's SUMF 17-19). This is combined with a non-threatening individual who was initially seized without probable cause, which is also unreasonable as a matter of law. Accordingly Defendant Cash is liable for failure to intervene on both counts.

H.    **Defendant Davis, in His Official Capacity, Is Liable Under Monell.**

A municipality or its equivalent cannot be held liable under § 1983 solely because it employs a tortfeasor. *Monell* v. *Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Instead, liability arises when execution of the government's "policy or custom" inflicts the injury. *Id.* At 694.

1.   **Applicable Law**

A municipality's failure to train its employees can establish Monell liability where "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton* v. *Harris*, 489 U.S. 378, 390 (1989) (citing *Tennessee* v. *Garner*, 471 U.S. 1 (1985) ("can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberately indifferent' to the need")).

2.   **Application of Law to the Facts**

This exact scenario is present here. The defendants' own words and actions prove a training inadequacy so severe, it caused them to apply an almost decade old repealed legal standard. Their justification relies on the antiquated concept of "cussing in the street" as a crime, defined by the now-repealed. § 14-197. (Pl's SUMF 6, 7, 16, 20, 22, 24). An officer who applies a legal standard that was repealed almost a decade ago demonstrates a catastrophic failure of basic legal training, which shows he was never properly trained on the current law. *See Lewis* v. *New Orleans*, 415 U.S. 130 (1974) (invalidating similar laws on cursing). Plaintiff contends that this is a failure to train on its face.

Defendant Davis was placed on direct notice of this systemic failure by Plaintiff's formal complaint (Pl's SUMF 30-33), which is forwarded directly to Defendant Davis' office, per office policy. A reasonable investigation would have revealed the officers were enforcing a repealed legal standard, and the obligation to correct the issue. If Plaintiff's complaint did not reach Defendant Davis' desk, Plaintiff's hand delivered letter certainly did. (Pl's SUMF 32).

### 3. **Conclusion**

Choosing not to investigate would demonstrate a conscious disregard for the consequences of the inadequate training. This is the epitome of the "obvious" exception in *Harris*, 489 U.S. at 390 (1989). No evidence has been presented by Defendants, to show that Defendant Cash has had training since April 26, 2024, corrective or otherwise. (Pl's SUMF 37)

If Defendant Davis did investigate the complaint filed by Plaintiff, he would have seen the repealed legal standard being enforced and been obligated to mandate corrective training for the Defendants, Corporal Caine, and the unnamed Deputy. The record shows Defendant Estes was promoted two ranks within a year surrounding these events, and Defendant Cash was also promoted after the unlawful arrest of Plaintiff (Pl's SUMF 35-36). The record does not reflect that Defendant Davis took any corrective action against Defendants Estes or Cash, nor has Defendant Davis offered any evidence of doing so. Defendant Davis is still defending these objectively unethical actions here in this case. This deliberate indifference is further confirmed by the combination of rapid promotion and a complete failure to retrain, objectively demonstrating a policy of deliberate indifference to the rights of citizens. Defendant Cash's last verifiable training was a 4 hour course that was started on April 25, 2024, and completed on April 26, 2024, months prior to Plaintiff's arrest (Pl's SUMF 37). These facts objectively demonstrate a failure to train, but a tendency to ratify, by Defendant Tyree Davis.

### I. **Defendants Are Not Entitled to Qualified Immunity.**

"The doctrine of qualified immunity protects government officials 'from liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson* v. *Callahan*, 129 U.S. 808 S.Ct. 815 (2009) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

The right to be free from arrest for criticizing police officers was clearly established in *City of Houston* v. *Hill*, 482 U.S. 451 (1987). No reasonable officer could believe that arresting a citizen for saying, "Imma say what the hell I want to say" after criticizing another officer's driving, was lawful (Pl's SUMF 7-11). No reasonable officer could believe that in 2024, the concept of "cussing on a highway" was illegal, considering it had been removed from North Carolina law for almost a decade. (Pl's SUMF 6, 7, 16, 20, 22, 24). No reasonable officer would allow a subordinate to make an unlawful arrest in front of them and help fabricate probable cause. No reasonable officer would allow a subordinate to purposefully construct the back seat of a patrol vehicle, to be an instrument of passive oppression and fail to intervene. Furthermore no reasonable Sheriff would ratify such behavior. The undisputed facts are so one sided in this case, that when viewing them in the light most favorable to Defendants and even assuming arguendo, no reasonable jury could, or would rule in the favor of Defendants. Plaintiff is entitled to summary judgment on his claims as a matter of law. Accordingly, Plaintiff is entitled to damages against all defendants on all claims included in this motion. Any claims not included in this motion will not be sought in this court.

III. **CONCLUSION AND REQUEST FOR RELIEF**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant his Motion for Summary Judgment in its entirety, enter judgment in his favor on all counts—including his claims for First Amendment Retaliation, False Arrest, Excessive Force, Malicious Prosecution, Failure to Intervene, and Monell Liability—and set this matter for a trial on damages.

Respectfully submitted this 1st day of December, 2025

Terrance Johnson II
400 West 3rd Street
Apt 6
Weldon, North Carolina 27890
Telephone: (252) 529-5022
Email:terrancejohnson2008@yahoo.com
Plaintiff, pro se

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the forgoing **MEMORANDUM OF LAW** has

been sent to the following Attorney for the Defendants via United States Postal Service on this 1 day of

December, 2025.

Erin H. Epley
One West Fourth Street
Winston-Salem, North Carolina 27101
Telephone: (336) 747-6624


Terrance Johnson II
400 West 3rd Street
Apt 6
Weldon, North Carolina 27890
Email:TerranceJohnson2008@yahoo.com
Telephone: (252)529-5022
Plaintiff, pro se