IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No. 5:25-CT-03011-BO

| | | |
|---|---|---|
| TERRANCE JOHNSON, II, pro se | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **PLAINTIFFS MEMORANDUM** |
| | ) | **OF LAW IN SUPPORT OF HIS** |
| v. | ) | **RESPONSE IN OPPOSITION** |
| | ) | **TO DEFENDANTS' MOTION** |
| | ) | **FOR SUMMARY JUDGMENT** |
| NICOLAS ESTES, et al. | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |

NOW COMES Plaintiff Terrance Johnson, II, *pro se* and submit this Memorandum of

Law in opposition to Defendants' Motion for Summary Judgment pursuant to Rule 56 of the

Federal Rules of Civil Procedure.

**INTRODUCTION**

This case arises from an unlawful arrest and unreasonable use of force by Halifax County

Sheriff's deputies on July 7, 2024. Plaintiff was seized and tackled after less than 30 seconds of

remonstrating against an officer's driving. The undisputed evidence shows Plaintiff's conduct

was protected by the First Amendment, Plaintiff complied with Defendant Estes' directives, that

no warning or command preceded the seizure, and that the force used was objectively

unreasonable under the circumstances. Moreover, the record also shows deliberate indifference,

failure to intervene, malicious prosecution, as well as claims against the final policymaker. The

officers' actions violated clearly established constitutional rights.

## STATEMENT OF FACTS

After midnight on July 7, 2024 officers were dispatched to the scene of an assault that was taking place in the immediate vicinity of an annually permitted block party happening at 407 Chestnut Street; upon their arrival, a female began to "actively passing out [due to a] possible seizure."(Doc. 41-1, p. 15 lines 1-13, p. 20 lines 36-38; Johnson Decl. ¶ 2). Knowing of an annual block party in the neighborhood and observing red flashing lights from an ambulance, Plaintiff became worried and stepped outside of his apartment; at which point he walked across the street to ask his neighbor if she knew what was happening. (Doc. 46, Seicane video 00:02:40-00:02:48; Johnson Decl. ¶ 2). After less than a minute of conversing with his neighbor Plaintiff saw a patrol vehicle park at the intersection across the street from where he was standing. *Id.* While walking across the street to go home, Plaintiff verbally objected to a deputy's driving while using profanity, but to no person in particular. (Johnson Decl. ¶ 3-4).

Upon crossing over West Third Street, Plaintiff encountered and had a brief twenty second argument with a deputy later identified as Defendant, Corporal Nicolas Estes, which was captured on video. (Doc. 46, Seicane video, 00:02:48-00:02:51; Doc. 54, Defs.' Ex. 3 Estes Bodycam, 00:00:27-00:00:50; Johnson Decl. ¶ 5). As Plaintiff walked away, Defendant Estes attempted to seize Plaintiff but failed to issue a verbal command in furtherance of doing so, causing a brief struggle to ensue. (Doc. 54, Defs.' Ex. 3, 00:00:46-00:01:10; Defs.' Ex. 4 Cash Bodycam, 00:00:27-00:00:51; Johnson Decl. ¶¶ 6-7). Plaintiff fell and Defendant Estes tackled him back to the ground. *Id.* Defendant Cash saw these events and commanded Plaintiff to "put [his] hands behind [his] back," to which Plaintiff complied immediately. *Id.* Plaintiff was then intentionally subjected to elevated temperatures in the rear of a patrol vehicle while Plaintiff

cried out to officers within earshot, including Defendant Cash, but was given no relief. (Doc. 54, Defs.' Ex. 4, 00:00:48-00:02:53; Johnson Decl. ¶¶ 7-8). Plaintiff was charged with Disorderly Conduct under N.C. Gen. Stat. § 14-288.4 and Resisting a Public Officer under N.C. Gen. Stat. § 14-223. (Doc. 41-1 pp. 4-5). Defendant Estes authored and Defendant Cash approved, an incident report that contained material falsities. (Doc. 41-1 p. 24; Johnson Decl. ¶ 5). Plaintiff subsequently treated at ECU Health for minor injuries. (Doc. 41-1 pp 6-7; Johnson Decl. ¶ 10). Plaintiff filed a formal complaint with the Sheriff's Office and delivered a letter for Sheriff Davis, which were both ignored. (Doc. 41-1 pp 8-11; Johnson Decl. ¶ 10). Both criminal charges were dismissed without leave on November 13, 2024. (Doc. 41-1 pp. 12-13). Plaintiff filed his Complaint on January 13, 2025 and subsequently obtained the bodycam videos of Defendant Estes and Defendant Cash via Court Order on February 4, 2025. (Doc. 1; Doc. 33-1 pp. 2-3, 5). Defendants Cash and Estes were both promoted after Plaintiff's rights were violated. (Doc. 41-1 pp. 27-30).

## PROCEDURAL BACKGROUND

On January 13, 2024, Plaintiff filed his Complaint, asserting claims under 42 U.S.C. § 1983. (Doc. 1). Upon initial review, the court dismissed multiple claims and defendants, but allowed Plaintiff to proceed against Defendant Estes, Defendant Cash and Sheriff Davis under limited theories. (Doc. 6). Plaintiff later voluntarily dismissed Captain Roy Rooks, as Plaintiff mistook him for Corporal Guy Caine during the incident. (Doc. 10). Defendants answered Plaintiff's Complaint on June 2, 2025 denying liability and asserting affirmative defenses. (Doc. 18). Plaintiff later filed a motion for summary judgment, a memorandum of law, a statement of undisputed material facts and an appendix of exhibits along with video evidence. (Docs. 38, 40, 41, 41-1, 39, 46). Defendants later filed a motion for summary judgment, a memorandum of law

in support of their motion for summary judgment, a purported local civil rule 56(a)(1) statement of material facts, video exhibits and declarations from Defendant Estes and Defendant Cash, and an appendix to Defendants' rule 56.1 Statement of material facts. (Docs. 47, 48, 49, 50, 54, 56, 57).

The summary judgment record contains filings made by Plaintiff and Defendants, which include but are not limited to, a Magistrates Order from Plaintiff's July 7, 2024 arrest (Doc. 41-1, pp. 4-5); an after visit summary from Plaintiff's hospital visit (Doc. 41-1, pp. 6-7); a formal complaint and letter (*Id.* pp. 8-11); a dismissal notice; CAD/radio extracts establishing the exact location of the contested "crowd" as 407 Chestnut St. (*Id.* p. 20 line 38); the narrative from Defendant Estes' incident report (*Id.* pp. 24); Halifax County Sheriff's Office policies; Bodyworn Camera Footage (Doc. 54, Defendants Exhibit 3, Defendants Exhibit 4); and training records.

## STANDARD OF REVIEW

Summary judgment is appropriate only when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Parties agree that "[t]he movant may meet its burden by showing an absence of evidence to support the nonmovant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A dispute is 'genuine' only if a reasonable jury could return a verdict for the nonmovant; 'material' facts are those that affect the outcome under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court draws reasonable inferences for the nonmovant but does not credit mere conclusory assertions or speculation. 'When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a

court should not adapt that version of the facts for purposes of ruling on a motion for summary judgment.' *Scott v. Harris*, 550 U.S. 372, 380 (2007)" (Doc. 48 p. 4).

## ARGUMENT

**I. The undisputed facts do not establish probable cause for the arrest under N.C. Gen. Stat. §§ 14-288.4.**

**Issue:** Plaintiff's initial language was uttered in reaction to watching a vehicle rapidly approach him, and consisted of exclaiming "that's stupid what the fuck is his problem," but to nobody in particular. (Doc. 54, Defs.' Ex. 3 00:00:14-00:00:33; Johnson Decl. ¶ 4). During a subsequent 20 second consensual encounter Plaintiff stated "no that's bullshit" in response to Defendant Estes' excuse of "blue lights"; "what the fuck is you doing" to Corporal Caine as he drove past; "I don't give a fuck" after not liking Defendant Estes' second offered excuse of "blue lights"; and in response to Defendant Estes' directive to "quit cursing and carry [his] ass down the street," uttered "Imma say what I want to say yes Imma say what the hell I want to say" while disengaging *four seconds* later to deescalate. (Doc. 54, Defs.' Ex. 3 00:00:30-00:00:50; Johnson Decl. ¶¶ 5-6).

Defendants cite "*United States v. Bartow*, 997 F.3d 203, 207-208 (4th. Cir. 2021)" as establishing a Fourth Circuit emphasis on "context, including time, place, volume, gestures, crowd dynamics, and officer-safety considerations." (Doc. 48, p. 5). Defendants assert "noncompliance with a directive to calm down" as legal justification as to why Defendant Estes went hands on with Plaintiff. *Id.* Defendants concede that this Court could "conclude on this record that a disorderly conduct conviction would be barred on First Amendment grounds." *Id.*

The Magistrate's Order charges Plaintiff with violating N.C. Gen. Stat. § 14-288.4 alleging Plaintiff "unlawfully and willfully did intentionally cause a public disturbance" by "using abusive language intended and plainly likely to provoke immediate violent retaliation and thereby cause a breach of the peace." (Doc. 41-1, p. 5). Plaintiff's purported criminal acts were saying "WHAT THE F**K IS THIS OFFICERS PROBLEM and THATS BULLSH** IN FRONT OF A LARGE CROWD OF PEOPLE." *Id.* Defendant Estes falsely associated Plaintiff with the distant block party, writing in his subsequent incident report that, "all this was said in front of a large crowd of people at a block party while standing in the middle of W. Third St," and that Plaintiff "took off running, [he] then ran after [Plaintiff] and [Plaintiff] fell." (Doc. 41-1, p. 24).

Defendants contend that on top of the purported crowd that was claimed to be within earshot, Plaintiff's proximity contentions are regarding a "larger crowd" at 407 Chestnut Street. (Doc. 48, p. 3). The video record provides *one* older lady that Plaintiff had a minute long conversation with prior to Defendant Cash arriving on scene, no "crowd," small or large. (Doc. 46, Seicane video, 00:02:40-00:02:48; Johnson Decl. ¶ 2). This lady received a phone call while talking to Plaintiff, and was engaging in a phone conversation prior to, during, and after Plaintiff's arrest. (Doc. 54, Defs.' Ex. 3, 00:00:14-00:01:18; Johnson Decl. ¶ 2). This lady also did not speak or protest, but simply walked away after Plaintiff was arrested. *Id.* Defendants later stated that, "Plaintiff's contention that the incident report overstated crowd proximity does not create a genuine dispute of material fact." (Doc. 48, p. 5). Defendants Estes and Cash, both refer to their arrival to the scene as "[they] responded to the area of Chestnut Street and West Third Street." (Doc. 57, Estes Decl. ¶ 2; Doc. 56, Cash Decl. ¶ 2).

**Rule**: The parties agree that "North Carolina's disorderly conduct statute prohibits intentionally causing a public disturbance by utterances or abusive language intended and plainly likely to provoke immediate violent retaliation. See N.C. Gen. Stat. § 14-288.4." (Doc. 48, p. 4). Parties further agree that "[a]lthough the First Amendment protects profanity and criticism of police in many contexts, it does not immunize 'fighting words,' true threats, or conduct plainly likely to provoke immediate violence. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)." (Doc. 48, p. 5 ). "The 'small class' of 'fighting words' is limited to 'direct personal insults'—statements clearly 'directed to the person of the hearer,' who is 'actually or likely to be present.' *Bartow*, 997 F.3d at 207 (quoting *Texas v. Johnson*, 491 U.S. 397, 409 (1989)). Probable cause is provided when the facts as known to a "reasonable and prudent person," would lead them to believe that there is a "fair probability" that criminal conduct has occurred, "under the totality of the circumstances." *Florida v. Harris*, 568 U.S. 237, 244 (2013). "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston v. Hill*, 482 U.S. 451, 462-463 (1987). The decision in *Hill* "reflects the constitutional requirement that, in the face of verbal challenges to police action, officers and municipalities must respond with restraint." *Id.* at 471.

**Application**: Defendant Estes repeatedly asserted to Plaintiff that he would go to jail for "cursing in the street," stating, "you're gonna have to quit cursing and carry your ass up the street," "no sir you can't curse in the street like that," and later telling Plaintiff's wife, "so what's going on is, I tried to talk to him and he was cursing in the street, you can't curse on a North Carolina highway like that." (Doc. 54, Defs.' Ex. 3, 00:00:36-00:00:50, 00:03:16-00:03:26, Defs.' Ex. 4, 00:00:59-00:01:02, 00:02:56-00:03:05). This repeated assertion reflects a legal

standard that does not correspond to the elements of any current North Carolina criminal statute. Instead, it mirrors the elements of repealed former N.C. Gen. Stat. § 14-197. N.C. Gen. Stat. § 14-197 was then violated if a person "used indecent or profane language (1) on a public highway, or (2) in the hearing of two or more persons, or (3) in a loud and boisterous manner." State v. Smith, 137 S.E.2d 819, 820 (1964). N.C. Gen. Stat. § 14-197 was repealed effective in 2015 and no longer provides a lawful basis for arrest.

Defendants boldly assert "Plaintiff's own account *confirms* loud profanity in the street shortly after midnight and noncompliance with a directive to *calm down*." (Doc. 48, p. 5). The word "confirm" indicates a mutual agreement, which would imply that Defendants hold this position. Defendants do not contend that Plaintiff failed to follow Defendant Estes' directives to "quit cursing and carry [his] ass down the street." Saying that Plaintiff did not "calm down" is a subject to interpretation as the phrase is ambiguous in nature. Uttering the phrases "what the fuck is his problem," "what the fuck are you doing," and "I don't give a fuck," only to later soften in both tone and language to "Imma say what I want to say yes Imma say what the hell I want to say," while *walking away to deescalate*, could lead a reasonable officer to believe that Plaintiff showed an *intention* and *acted* in furtherance of following the directive to "calm down." (Doc. 54, Defs.' Ex. 3, 00:00:30-00:00:50). Maybe Defendant Estes believed that Plaintiff did not calm down *enough*, but to say that there was an "ignored directive to calm down," is a conclusory assertion based in conjecture and speculation. (Doc. 48, p. 7). Plaintiff contends that he *did* in fact calm down to his understanding. Corporal Estes effected a seizure based on conflicting interpretations as to the definition of the phrase "calm down." Defendants cannot realistically expect to *stand* upon the idea that Plaintiff did not "calm down" enough as a foundation for probable cause, as this is an open admission to violating Plaintiff's freedom of expression in the

most traditional sense of the word "expression." Critically, Defendants admit that "the First Amendment protects profanity and criticism of police in many contexts," while simultaneously arguing that "profanity in the street" and "noncompliance with a directive to calm down," provided probable cause for Plaintiff's arrest. (Doc. 48, p. 5).

Defendants appear to hold the internally inconsistent position that "even excising [the] description" of a crowd, "the First Amendment protects profanity" but not "in the street shortly after midnight," and "criticism of police in many contexts" is protected, but not in "reaction to police presence and driving" and only when you are "calm." (Doc. 48, pp. 3, 5, 7). Defendants' theory simply collapses under its own contradiction.

Defendants Estes and Cash both describe their arrival to the scene as "I responded to the area of Chestnut Street and West Third Street." (Doc. 57, Estes Decl. ¶ 2; Doc. 56, Cash Decl. ¶ 2). By referring to the scene as "the area of Chestnut Street and West Third Street," Defendants Cash and Estes omitted that dispatch identified a *specific* address approximately 500 feet away from that location. (Doc. 41-1, pp. 25-26). CAD extracts show that officers did not have a clear indication to "shut it down" but were told to "proceed to 407 Chestnut Street" to help with "crowd control" at the location of an assault and a medical emergency, but Plaintiff was arrested at "Chestnut St/Hwy 301" (Doc. 41-1, p. 15 lines 2-13, p. 16 line 19-21, p. 20 lines 36-38, p. 21 lines 5, 7, 11, 15, 20). For illustration, Plaintiff offers that a football field is 360 feet, counting both end zones. 500 is the distance of one full football field and an additional 46 yards, which is confirmed visually by Defendant Cash's bodycam video. (Doc. 54, Exhibit 4, 00:00:00-00:00:27). This imprecision of crowd location *is* material, and it suggests Defendants Cash and Estes broadened the scope of their scene beyond the area of their dispatched purpose, thereby encountering Plaintiff without any individualized suspicion. Simply put, if they *had*

encountered a crowd at West Third Street, which they did not, they were to "proceed to 407 Chestnut," because *that* was the location of the emergencies and crowd of "200 people."

Defendants contention that Plaintiff is contesting the proximity of a "larger crowd" at 407 Chestnut Street is simply an incorrect assertion (Doc. 48, p. 3). The factual presence of the crowd at 407 Chestnut Street is well established and has never been contested by Plaintiff. Plaintiff contests the presence of a crowd on West Third Street at the time of Plaintiff's arrest. (Doc. 46, Seicane video, 00:02:35-00:02:48; Doc. 54, Ex. 3  00:00:00-00:01:10; Ex. 4  00:00:00-00:00:58; Johnson Decl. ¶ 2-7). In the current case, Defendants have failed to present evidence establishing the factual location of *one* crowd in which they rely upon, let alone identified an *additional* crowd that Plaintiff is purportedly overlooking on the *video record*. This represents an unanticipated departure from the facts established by the bodycam video that Defendant Estes himself swore "fairly and accurately depicts the events as [he] experienced them." (Doc. 57 ¶ 6). Defendants' want for a crowd presence and their want for probable cause is made readily apparent, by the fact that they so vehemently contend that Plaintiff's conduct was "likely to provoke further escalation or a breach of the peace," while absent, is a single time stamped citation to the video record, which provides three separate angles and up to an hour of real time footage to help substantiate the genuineness of their claims. *Id.* at ¶ 3. Defendants have not produced one scintilla of objective evidence placing a crowd at the scene of Plaintiff's arrest. Twenty sworn declarations from officers, do not make a crowd apparent in the face of three videos showing its absence.

By contrast, Plaintiff's First and Fourth Amendment claims rest *entirely* on, and are *exclusively* established by the video record itself, as does his contention that there was no "crowd" within earshot. The presence of a crowd is a "factual issue," and for purposes of

summary judgment the court should not adopt "visible fiction," but should view the crowd presence "in the light depicted by the videotape." *Harris*, 550 U.S. at 380-381. Absent a crowd within earshot, there is not a "fair probability" of a breach of the peace; however, a crowd of onlookers would not magically create a "fair probability" that Plaintiff's language would have satisfied the element of "intended and plainly likely to provoke violent retaliation" under N.C. Gen. Stat. § 14-288.4. *Harris*, 568 U.S. at 244 (*see also United States v. Marshall*, No. 16-4595 at 8 (4th Cir. 2018) (Finding there is not a "fair probability" that the defendant's words would have breached the peace absent a crowd). Likewise, a reasonable officer could not conclude that a single older lady, who was mute during a twenty second argument before walking away, constitutes an imminent threat of a breach of the peace, as there is simply not a "fair probability." *Id.*

Defendants cite *Bartow*, 997 F.3d at 207-208 as a Fourth Circuit authority which purportedly limits the First Amendment, by emphasizing "time, place, volume, gestures, crowd dynamics, and officer safety considerations." (Doc. 48, p. 5) (*cf Bartow*, 997 F.3d 207-208). The opinion in *Bartow* contains no such discussion. The factual circumstances of *Bartow* include the following: Jules Bartow walked into a store during store hours searching for boots; elevated the volume of his speech; used inflammatory language, resulting in a crowd of onlookers; gestured and pointed his finger at an individual to which he used a racial epithet; aroused and argued with an individual that his language was not directed toward; and had his conviction vacated despite these factual circumstances. *See Bartow*, 997 F.3d 203. If that case turned on volume, crowd dynamics, or place or time, the judgment likely would have been affirmed, as *none* of those factors weighed in Bartow's favor. The case turned on whether Bartow's words were "likely to, or actually did, invoke a violent response." *Id.* at 210. This places a high bar on what language

can reasonably be deemed a breach of the peace in the Fourth Circuit. Defendants cited a case that not only does not contain the proposition in which they intend to stand upon, but works against them, and in favor of establishing Plaintiff's claims.

In applying *Bartow* to the current case, the Court "must 'consider[] the actual circumstances surrounding such expression.'" *Id.* at 208 (quoting *Johnson*, 491 U.S. at 409). The language must be "likely to provoke a violent reaction . . . by the person to whom, individually, [it was] addressed," *Id.* at 211. (quoting *Mercer v. Winston*, 199 S.E.2d 724, 726 (1973). Here, the "hearer" was Defendant Estes. Plaintiff's brief use of profanity and subsequent wording were expressions of frustration and protest, not fighting words or incitement. Plaintiff's language and actions could not be reasonably characterized as "abusive" even in a common sense, let alone have some malicious meaning or intent to breach peace. Plaintiff's language and actions at worst, did not present imminent danger of provoking a violent reaction from the single onlooker who was engaging in a phone conversation, nor did Plaintiff threaten Defendant Estes, who as an officer has a constitutional obligation to act with "restraint." *Hill*, 482 US at 471. Thus, comparing the facts and ruling in Bartow, to the current case, the record weighs substantially in Plaintiff's favor.

Here the facts demonstrate that Plaintiff "orderly, even if loudly, remonstrate[d]" against Defendant Estes and did not utter fighting words, incite violence, or threaten anyone. *State v. Humphreys*, 853 S.E.2d 789, 796 (2020). As previously noted, the video record confirms that Plaintiff *complied* with all directives including "calm[ing] down." (Doc. 54, Defs.' Ex. 3 00:00:30-00:01:10; Defs.' Ex. 4, 00:00:30-00:00:57). Even assuming arguendo that there *was* a crowd present, no reasonable officer could believe that Defendant Estes had probable cause to believe that Plaintiff's language or purported "noncompliance with a directive to calm down"

satisfied the element of "abusive language which is intended and plainly likely to provoke violent retaliation and thereby cause a breach of the peace," regardless of who was standing outside at the time. N.C. Gen. Stat. § 14-288.4.

**Conclusion**: Under the facts set forth by the record, Plaintiff's actions would not lead a reasonable person to believe that a breach of the peace occurred under N.C. Gen. Stat. § 14-288.4, or that one was even imminent under the circumstances. The only thing imminent at the time was Plaintiff walking into his apartment. Simply put, the record does not make out a prima facie case of disorderly conduct under N.C. Gen. Stat. § 14-288.4. Defendants admit to First and Fourth Amendment violations in this case. Even under Defendants' version of facts, Plaintiff is entitled to summary judgment on this issue. Accordingly, Defendants are not entitled to qualified immunity.

## II.    Resisting arrest under N.C. Gen. Stat. § 14-223 requires a lawful arrest

**Issue**: Defendants contend that "[e]ven if the Court were to conclude on this record that a disorderly conduct conviction would be barred on First Amendment grounds, the undisputed pulling away from the officer during a lawful public-order response independently provided probable cause for a violation of section 14-223 of the North Carolina General Statutes. *See State v. Humphreys*, 853 S.E.2d 789, 796-797 (2020) (discussing 'willful' under section 14-223)." (Doc. 48, p. 5). Defendant Estes at no time had "reasonable suspicion, based on objective facts, that [Plaintiff was] involved in criminal activity." *Harris*, 568 U.S., 51 (1979).

The grab by Defendant Estes was sudden and without warning, while Plaintiff walked away with his back turned. There was no command issued by Defendant Estes, before or during the ensuing struggle, that would have placed Plaintiff on notice that he should not continue

walking as he was *directed to* seconds prior. (Doc. 54, Defs.' Ex. 3, 00:00:42–00:00:55). A frame by frame viewing of Defendant Cash's bodycam footage, could also lead a reasonable jury to conclude that Defendant Estes attempted to throw Plaintiff to the ground *immediately* upon making contact. (Doc. 54, Def' Ex. 4, 00:00:30-00:00:33). After Defendant Cash commanded Plaintiff to "put [his] hands behind [his] back," Plaintiff immediately complied. (Doc. 54, Defs.' Ex. 4, 00:00:30–00:00:56)

**Rule**: Parties agree that "[t]he resisting/delaying/obstruction statute prohibits willfully resisting, delaying, or obstructing an officer discharging official duties. *See* N.C. Gen. Stat. § 14-223." (Doc. 48, pp. 4-5). However, in the State of North Carolina, there is a long established principle that "[t]he offense of resisting arrest both at common law and under statute, G.S. § 14-223, presupposes a lawful arrest. It is axiomatic that every person has the right to resist an unlawful arrest." *State v. Mobley*, 83 S.E. 100, 102 (1954) (citing *State v. Beal*, 87 S.E. 416 (1915). Also noted is the fact that "in no event may a conviction of the offense of resisting arrest be predicated upon resistance of an unlawful arrest." *Id.* (citing *State v. Allen*, 80 S.E 1075 (1914)). "To justify an arrest in order to 'prevent' a breach of the peace, ordinarily there must be at least threat of a breach of the peace, together with some overt act in attempted execution of the threat….a breach of the peace is threatened within the meaning of the statute if the offending person's conduct under the surrounding facts and circumstances is such as reasonably justifies a belief that the perpetuation of an offense amounting to a breach of the peace is imminent." *Id.* at 104 (citing *Quinn v. Heisel*, 40 Mich. 576 (1879)).

"When used in [N.C.G.S. § 14-223], 'willful' is to be interpreted as something more than an intention to do a thing. It implies doing [of] the act purposely and deliberately, indicating a purpose to do it without authority–careless whether [someone] has the right or not–in violation of

law, and it is this which makes the criminal intent without which one cannot be brought within the meaning of a criminal statute." *Humphreys*, 853 S.E.2d at 796-797. To determine willful intent, the Court must consider the "acts and conduct of the defendant and the general circumstances existing at the time[.]" *Id.* at 797 (quoting *State v Norman*, 188 S.E.2d 667, 670 (1972)).

**Application**: Defendant Estes at no time had "reasonable suspicion, based on objective facts, that [Plaintiff was] involved in criminal activity." *Brown v. Texas*, 443 U.S. 47, 51 (1979). No reasonable person would believe that "an arrest [was] necessary in order to 'suppress or prevent' a breach of the peace" under the totality of the aforementioned circumstances. *Mobley*, 83 S.E.2d at 104. Defendants [fail[]] to show prima, facie that [Plaintiff's] conduct at the time of the arrest amounted either to an actual or threatened breach of the peace within the intent of G.S. [§ 14-288.4]. Hence, the arrest must be treated as illegal. This being so, [Defendants] failed to make out a prima facie case of resisting arrest." *Id.* at 106.

The provided proposition fatally undermines Defendants' contention that the officer had probable cause to charge Plaintiff under N.C. Gen. Stat. § 14-223, as an illegal arrest "may be resisted by the use of [limited] force, as in self defense." *Mobley*, 83 S.E.2d at 102. Under the principles set forth in *Mobley*, Defendants' want for probable cause cannot be "predicated upon [Plaintiff's] resistance to an unlawful arrest," as it was Defendant Estes in this situation who was "in the position of a wrongdoer." *Id.*

The legal principle discussed in *Humphreys* actually supports the idea that Plaintiff's actions were *not* willful, as here Plaintiff would be required to *knowingly* violate a statute, in order to have "willful" intent. *Humphreys*, 853 S.E.2d at 796-797. In this situation, Defendant

Estes would have had to *first* be provided with reasonable suspicion or probable cause *for* a detention or arrest, for resistance to "independently provide[] probable cause" to arrest Plaintiff under N.C. Gen. Stat. § 14-223. (Doc. 48, p 5). Furthermore, logically, Plaintiff would have to actually *know* that he is being arrested for resistance to be "willful." *Humphreys*, 853 S.E.2d at 796-797. Defendant Estes did not say anything prior to aggressively grabbing Plaintiff. The circumstances of this case do not provide room for a "fair probability" of willful intent. *Harris*, 568 U.S. at 244. Defendants' position in this instance is not supported by common law or statute..

**Conclusion**: Plaintiff's actions do not satisfy key elements of *both* criminal statutes under which he was charged, leading a reasonable person to believe that there was no probable cause for Plaintiff's arrest. Likewise, without suspecting Plaintiff of criminal conduct, Defendant Estes lacked the reasonable suspicion needed to restrict Plaintiff's movement from the inception of contact. In the State of North Carolina, the well settled law does not afford Defendants the ability to obfuscate an initial erroneous application of a disorderly conduct statute as we have here, and stand upon a want for probable cause in regard to a resisting a public officer charge which requires *willful* intent. Plaintiff's arrest was unlawful as a matter of law, and Plaintiff is entitled to summary judgment even under Defendants' version of events. Accordingly, Defendants are not entitled to qualified immunity.

## III.    The Seizure and Force Used Were Unreasonable Under the Fourth Amendment

Noted in the aforementioned sections, is the fact that Plaintiff contests Defendants' claim that Plaintiff engaged in "immediate resistance in response to verbal commands," as Plaintiff

complied with every verbal command given by both deputies. The parties agree that "[e]xcessive force claims are evaluated under the Fourth Amendment's objective reasonableness standard, considering the severity of the crime, the immediate threat posed and active resistance or flight. *Graham v. Connor*, 490 U.S. 386, 396-397." Also considered is "the extent of the plaintiff's injuries." *Hupp v. Cook*, 931 F.3d 307, 322 (4th Cir. 2019) (citing *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994)).

1.  A Court "may consider any lack of probable cause for the arrest... in connection with [the] overall analysis of *all* of the circumstances surrounding the use of force. *Id.* (citing *Graham*, 490 U.S. at 396). Ultimately the Court "must consider the crime that is alleged to have been committed." *Id.* (quoting *Graham*, 490 U.S. at 396).

Here Plaintiff was accused of violating two minor statutes, N.C. Gen. Stat. § 14-288.4, and N.C. Gen. Stat. § 14-223.Plaintiff was engaged in an act of remonstration against officer conduct that Plaintiff observed and experienced; nonetheless, Plaintiff was charged with two minor offenses, both of which Defendant Estes lacked probable cause as demonstrated in the previous sections and video record. Necessarily, this factor weighs in favor of Plaintiff as a matter of law.

2.  Plaintiff posed no threat, as he had his back turned to Defendant Estes, walking away as directed four seconds prior, while wearing no shirt, visually indicating he was not armed. Plaintiff also did not strike, kick, push or use any force against Defendant Estes, prior to or during the brief struggle. This factor also weighs in Plaintiff's favor.

3.  The sudden seizure caused Plaintiff to go into a frightened panic, and "instinctively try[] to protect himself from [Defendant Estes'] onslaught." *Rowland v. Perry*, 41

F.3d 167, 174 (4th Cir. 1994). The bodycam footage shows that at no point in time did Plaintiff make an effort to flee from Defendant Estes. (Doc. 54, Defs.' Ex. 3, 00:00:46–00:00:57; Doc. 54. Defs.' Ex. 4, 00:00:27–00:00:34). Accordingly, this factor weighs in favor of Plaintiff as a matter of law.

4.     Plaintiff luckily only had minor physical injuries resulting from this incident. (Doc. 41-1, pp. 6-7; Johnson Decl. 10). An excessive force claim does not turn on whether a plaintiff was fortunate enough to escape serious physical injuries or not, but "whether the totality of the circumstances justifie[d] a particular sort of... seizure." *Hupp*, 931 F.3d at 322. The extent of Plaintiff's injuries is "but one 'consideration in determining whether force was excessive.'" *Id.*

**Conclusion**: Defendants contend that Plaintiff "pulled his arm away and moved as if to flee," so "Defendant Estes executed a takedown." (Doc. 48, p. 6). The Fourth Circuit has "held that a reasonable officer could not believe that the 'initial act of pulling [one's] arm away' when an officer grabs a person 'without warning or explanation' justifies the officer's decision to throw the person to the ground." *Hupp*, 931 F.3d at 323 (*See* publicly available video of Tiffanie Hupp's arrest https://www.dailymail.co.uk/video/news/video-1272168/Moment-woman-steps-dog-cop-ready-s hoot-it.html ) (showing Tiffanie Hupp pull her arm away from Trooper Seth Cook who was denied qualified immunity for his alleged act of subsequently throwing her to the ground). "On these disputed versions of the facts, and in light of the other *Graham* factors that are unfavorable to [Defendant Estes], [the Court should not] say that a reasonable officer would consider [Defendant Estes'] use of force reasonable under the circumstances." *Id.* Thus Defendants should be denied qualified immunity at this stage at a minimum.

## IV.    Defendant Cash's Bystander Liability as a Matter of Law

**Issue**: Defendants focus on the "contact, pull away, and takedown to handcuffing." (Doc. 48, p. 6). However, the bystander liability under which Plaintiff claims, is due to Defendant Cash's failure to intervene to the extent of failing to stop an unlawful detention and arrest, as well as him failing to stop the intentional infliction of harm being perpetrated by Corporal Caine.

**Rule**: Bystander liability attaches when an officer fails to act, while having a "realistic opportunity to intervene and end the unlawful detention[.]" *Randall v. Prince George's Cnty.*, 302 F.3d 188, 204 (4th Cir. 2002). The officer must know that the individual was seized, that there was no probable cause to detain the individual, and that the individual is being held against their will. *Id.* Additionally, "deliberate indifference to serious medical needs... constitutes the unnecessary and wanton infliction of pain" *Scinto v. Stansberry*, 841 F3d 219, 225 (2016).

**Analysis**: Here, Defendant Cash observed Defendant Estes seize Plaintiff without probable cause. (Doc. 54, Defs.' Ex. 4, 00:00:27–00:00:40; Johnson Decl. ¶ 2-7). He had the opportunity and authority to intervene and stop an unlawful arrest, but did not do so. As a superior, Defendant Cash could have simply ordered Defendant Estes to uncuff Plaintiff and allow him to go home. Defendant Cash also could have refused to approve a report containing material falsities that he himself was on scene to witness. Defendant Cash also knew that Corporal Caine was intentionally inflicting harm upon Plaintiff and could have ordered him to turn on the vehicle and AC or lower its windows, but failed to do so. (Doc. 54, Defs.' Ex. 4, 00:00:48-00:02:53; Johnson Decl. ¶¶ 7-8). Any person of "common intelligence" would have visually seen and known that harm was being inflicted upon Plaintiff under the circumstances. United States v. Lanier, 520 U.S. 259, 266 (1997)

**Conclusion**: Despite having multiple opportunities to intervene, Defendant Cash failed to do so. Under Plaintiff's version of events, Defendant Cash is not entitled to qualified immunity.

## V.      Malicious Prosecution

**Issue**: Defendants assert that the contention of "a 'large crowd' is immaterial even excising that description, the facts support probable cause given the late-night street location loudly profane outbursts during an active police response, an ignored directive to calm down and immediate physical resistance." (Doc. 48 p. 7).

**Rule**: Parties agree that "[a] Fourth Amendment malicious prosecution claim requires seizure pursuant to legal process unsupported by probable cause and favorable termination. *Brooks v. City of Winston-Salem*, 85 F.3d 178, 183 (4th Cir. 1996)" (Doc. 48, p. 7). The element of favorable termination is satisfied by a criminal prosecution that ended with no conviction. *Thompson v. Clark*, 596 U.S. 36 (2022).

**Analysis**: As discussed above, Plaintiff's language and actions did not satisfy the element of "intended and plainly likely to provoke violent retaliation and thereby cause a breach of the peace." Plaintiff asserts that he did in fact "calm down." Plaintiff reiterates, absent a crowd, there is not a "fair probability." *Harris*, 568 U.S. 237, 244 (2013) (*see also Marshall*, No. 16-4595 at 8).

**Conclusion**: The dismissal without leave establishes a favorable termination. The absence of probable cause is apparent from the factual record. Under the totality of the circumstances, a reasonable jury could conclude that Defendant Estes and Defendant Cash were both conscious that Plaintiff was subjected to legal process under facts that did not provide

Defendant Estes with probable cause, and that the prosecution ended in a favorable termination. Under Plaintiff's version of events, he is entitled to summary judgment on his claims of malicious prosecution. Likewise, Defendant Estes and Defendant Cash are not entitled to qualified immunity.

## IV.    Sheriff Davis's Monell/Harris Liability

Plaintiff neglected to speak on the issue of individual liability for failure to train in his Motion for Summary Judgment and supporting documents. Plaintiff misspoke when saying "any claims not included in this motion will not be sought in this court." (Doc. 41, p. 22). Plaintiff still wishes to proceed on his individual capacity claim against Sheriff Davis for "fail[ing] to train defendants Estes [and] Cash[] regarding 'First Amendment protected speech' and failed to implement a policy which forbids Halifax County Sheriffs from turning off their vehicle's ignition when a passenger is in the vehicle" as the Court allowed. (Doc. 6, p. 4). Being a response in opposition to a Motion for Summary Judgment, appropriately Plaintiff will address the issue of Defendant Davis' liability in the context of both his individual and official capacity. Accordingly, the discussion that follows pertains to Sheriff Davis in his official and individual capacities.

**Issue**: Plaintiff based on his own recollection of the events, filed a formal complaint with the Sheriff's Department, which according to Halifax County Sheriff's Office policy, would be required to reach the desk of the Sheriff himself. (Doc. 41-1, pp. 8, 32 ¶ 2). Plaintiff also placed Sheriff Davis on *direct* notice via a letter that Plaintiff had suffered First and Fourth Amendment injuries resulting from his subordinate officers' actions. (Doc. 41-1, pp. 9-11; Johnson Decl. ¶ 10). Plaintiff's letter was ignored. (Johnson Decl. ¶ 10). Discovery responses and Defendant

Cash's training records show all online training and no training with regard to the First Amendment. (Doc. 41-1, p. 39 Interogg. ¶ 8, p. 45 Req. ¶ 8, pp. 48-56). No policy has been produced that would prohibit turning off a patrol vehicle's ignition with a person detained inside.

**Rule**: A municipality may be held liable for constitutional violations caused by its policy or custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). "It may happen that in light of duties assigned to specific officers or employees the need for more or different training is so obvious and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent policy for which the city is responsible, and for which the city may be held if it actually causes injury." City of *Canton v. Harris*, 489 U.S. 378, 390 (1989).

**Analysis**: An officer who so confidently and repeatedly asserts that it is unlawful in North Carolina to curse in the street, and who arrests an individual based on conduct criminalized by a statute repealed nearly a decade earlier, demonstrates a persistent lack of training concerning current First Amendment standards that can *only* be caused by failure to train officers surrounding the First Amendment. At the moment of arrest, "cursing in the street" was identified repeatedly as the offense, even by Lieutenant Cash. (Doc. 54, Defs.' Ex. 4, 00:04:21-00:04:30). Only later did Defendants recharacterize the arrest as based on alleged noncompliance with a "directive to calm down." This shifting justification underscores that the arrest was grounded in an unreasonably erroneous understanding of the law, rather than in objectively unlawful conduct. The need to update training is especially important when precedent changes, statutes are repealed, or constitutional boundaries shift. Corporal Estes was not properly trained to handle "cursing in the street" in a one on one encounter. CAD records

reflect that there were upwards of "250 people" at 407 Chestnut Street, many of whom were "in the street" and "not listening to anything." (Doc. 41-1, p. 21 lines 2, 3, 17, 18). In that context, it was entirely foreseeable that participants at a permitted block party would be "loudly cursing in the street shortly after midnight," and likely would have "ignored directive[s] to calm down." (Doc. 48, p. 7). By Corporal Estes's own stated standard of probable cause, any individual encountered at the scene who cursed or failed to satisfy his subjective understanding of "calm down" was subject to arrest. Under such a standard, a constitutional violation was not merely possible on July 7, 2024, it was inevitable. In the current situation the constitutional violation would not have occurred but-for an "obvious" failure to train Defendants Estes and Cash regarding the boundaries of First Amendment protected speech. *Harris*, 489 U.S. at 390.

There has not been any evidence provided, that shows Sheriff Davis issued remedial training to Defendants Estes and Cash following an arrest where Defendants themselves concede that this Court *could* conclude "a disorderly conduct conviction would be barred on First Amendment grounds," and even that there *may* be a "triable issue of a constitutional violation on Plaintiff's version of events." (Doc. 48, pp. 5, 9). Issuing no remedial training in this situation, amounts to ratification by the final policymaker. While Defendants may feel as if "Sheriff Davis had no personal involvement with Plaintiff," Defendant Davis had direct involvement through his receipt and deliberate non response to Plaintiff's formal complaint and hand delivered letter. Promoting the officers involved, while at the same time *refusing* to issue remedial training where deficiencies are readily apparent on bodycam video, demonstrates deliberate indifference to the deficiencies in training with regard to the First Amendment rights of Halifax County citizens and passersby.

Also lacking from the record, is any offered policy related to proper arrest procedures with regard to purposefully cutting off the ignition of patrol vehicles while a person is detained inside. (Doc. 41-1, p. 45 Req. 8-9). Turning off the ignition in what July heat, as happened in this situation, was unreasonable, and lacking a policy prohibiting such conduct, displays deliberate indifference to an "obvious" risk. *Harris*, 489 U.S. at 390. Sheriff Tyree Davis himself warned "[i]ts going to be another hot one today! Plan accordingly." 12 hours prior to Plaintiff's arrest https://www.facebook.com/share/p/1KPw7DCvjD/ (*See* publicly available Halifax County Sheriff's Office Facebook post warning the public of heat 12 hours prior to Plaintiff's arrest). In contrast to how Plaintiff was treated by officers, Defendant Estes *rightfully* did not allow his faithful K9 partner to be subjected to such harsh conditions. The officers felt a dog deserved better treatment than Plaintiff who was falsely arrested.

**Conclusion**: Under the current training and policy standards set by Sheriff Tyree Davis, a constitutional violation of this nature was inevitable and will occur again if not rectified. Accordingly, Defendant Davis should be denied qualified immunity.

## VII. Qualified Immunity Is Inapplicable

Defendants contend that this is possibly a sequence of "bad guesses in gray areas," and that Defendants did not "transgress[]" any "bright lines." *Maciariello v. Sumner*, 973 F.2d 925 (4th Cir. 1992) (*see also* Doc. 48, p. 9). Defendants further contend that "the law did not clearly establish that arresting an individual who was loudly cursing in a public street shortly after midnight during an ongoing police response, after a directive to calm down, and who then pulled away from an attempted detention, was unconstitutional." (Doc. 48, p. ¶ 2.).

**Rule**: Qualified immunity ensures that "[g]overnment officials performing discretionary functions are shielded from liability for money damages so long 'as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Maciariello*, 973 F.2d at 298 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." Lanier, 520 U.S. at 267. An "extreme level of factual specificity" is not "required in every instance to give fair warning." *Id.* at 268. "The burden of proof and persuasion with respect to a claim of qualified immunity is on the defendant official." *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003).

**Application**: Here Plaintiff was accused of breaching the peace under N.C. Gen. Stat. § 14-288.4 and resisting under N.C. Gen. Stat. § 14-223. These are not "vague criminal statutes." Lanier, 520 U.S. at 271. Defendants contend that the law must specify "that arresting an individual who was loudly cursing in a public street shortly after midnight during an ongoing police response, after a directive to calm down, and who then pulled away from an attempted detention, was unconstitutional." (Doc. 48, p. 9). Prima facie, this description does not satisfy the element of "intended and plainly likely to provoke violent retaliation" required by N.C. Gen. Stat. § 14-288.4, nor would a reasonable officer think so under the circumstances. Defendants seem in substance, to be contending that officers are liable "only if the constitutional right said to have been violated is first identified in a decision of [the] Court... and only when the right has been held to apply in 'a factual situation fundamentally similar to the one at bar.'" *Lanier*, 520 U.S. at 263. Defendants seem to lean on the premise rejected in *Lanier*, that "a decision of [the] Court or [an] extreme level of factual specificity... is necessary in every instance to give fair warning." *Lanier*, 520 U.S. at 268. Here, "in the light of pre-existing law the unlawfulness [under the

Constitution is] apparent. *Id.* at 271-272. Demanding a case on all fours as the only sufficient "fair warning" in these circumstances would be demanding "something clearer than 'clearly established,' [which] would, then, call for something beyond 'fair warning.'" *Id.* at 271. The Fourth Circuit explained that it has denied qualified immunity "based on the simple fact that the officer took a situation where there obviously was no need for the use of any significant force and yet took an unreasonably aggressive tack that quickly escalated it to a violent exchange when the suspect instinctively attempted to defend himself," as we have in the current case. *Smith v. Ray*, 781 F.3d 95, 104 (4th Cir. 2015) (citing *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994).

Nonetheless, Plaintiff offers the unpublished case *United States v. Marshall*, No. 16-4595 (4th Cir. 2018). In *Marshall*, there was a shooting around 10 PM. Three or four blocks away, two patrol officers observed a vehicle matching the description of the possible shooter. After cursing at police and refusing directives to calm down, Marshall was subsequently charged with disorderly conduct on top of multiple felonies for the items found inside the truck he was driving. The Fourth Circuit discussed the word "provoke," in reference to disorderly conduct, finding "[i]n the absence of the crowd, there would not be a fair probability." *Id.* at 8 (citing *Harris*, 568 U.S. at 244). Thus, the necessity of a crowd for a breach of the peace in this instance was clearly established.

**Conclusion**: For qualified immunity to apply, its *Defendants* who must demonstrate that their actions were objectively reasonable under the circumstances. Defendants fail to meet their "burden." *Wilson*, 337 F.3d at 397. The proper question to ask is "whether the state of the law in [2024] gave [Defendants] fair warning that their alleged treatment of [Plaintiff] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). The answer to that question is

undoubtedly yes. Plaintiff had a clearly established right to not be subjected to a false arrest under the circumstances. Accordingly, Defendants should be denied qualified immunity.

## V. CONCLUSION

Defendants' conduct was objectively unreasonable under the circumstances and violated clearly established law. Genuine issues of material fact exist as to each claim, and Defendants' own evidence confirms constitutional violations. For the foregoing reasons, Defendants' Motion for Summary Judgment should therefore be denied. Likewise, Plaintiff's Motion for Summary Judgment should also be granted.

Respectfully submitted this 6th day of January, 2026.

Terrance Johnson II
400 West Third Street
Apartment 6
Weldon, North Carolina 27890
Telephone: (252) 529-5022
Email:TerranceJohnson2008@yahoo.com
*Plaintiff, pro se*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and exact copy of the foregoing **PLAINTIFF'S**

**MEMORANDUM OF LAW IN SUPPORT OF HIS RESPONSE TO DEFENDANTS'**

**MOTION FOR SUMMARY JUDGMENT** has been sent to the following Attorney for the

Defendants via United States Postal Service on this 6th day of January, 2026.

Sonny S. Haynes
One West Fourth Street
Winston-Salem, North Carolina 27101
Telephone: (336) 721-3632
Facsmile: (336)726-2227

Terrance Johnson II
400 West 3rd Street
Apt 6
Weldon, North Carolina 27890
Email:TerranceJohnson2008@yahoo.com
Telephone: (252)529-5022
*Plaintiff, pro se*

**CERTIFICATION OF WORD/PAGE LIMIT COMPLIANCE**

I Terrance Johnson, hereby certify that this memorandum complies with the word limit established by the Eastern District of North Carolina. The memorandum in total contains 8381 words and 27 pages.

Terrance Johnson II
400 West Third Street
Apartment 6
Weldon, North Carolina 27890
Telephone: (252) 529-5022
Email:terrancejohnson2008@yahoo.com
*Plaintiff, pro se*