IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No. 5:25-CT-03011-BO

| | | |
|---|---|---|
| TERRANCE JOHNSON, II, pro se | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | **DECLARATION OF** |
| v. | ) | **TERRANCE JOHNSON II** |
| | ) | |
| | ) | |
| NICOLAS ESTES, et al. | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |

I, Terrance Johnson, II, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I, Terrance Johnson, II, am a citizen of the United States of America. I have personal knowledge of the matters set forth below. I submit this declaration based on my own observations on July 7, 2024, and records or bodycam videos that I have been provided via court order or discovery, or videos or records that I recorded or stored personally.

2. There has been an annual block party since I first moved to Weldon in 2020. I have never, and did not attend a block party on July 7, 2024. After midnight on July 7, 2024, I was inside my apartment and observed red flashing lights outside my window, that were consistent with an ambulance. Upon seeing this I became worried, knowing there was a block party a few blocks away; I then walked out to my front porch and saw a neighbor, an older lady that lives across the street, standing near the sidewalk. I walked across the street to speak with her and asked if she knew what was happening. She stated that she did not know. I continued

conversing with this neighbor for a brief moment; during this brief conversation, I saw a patrol vehicle park next to my landlord's building.

3.      Upon seeing the Deputy, later identified as Anthony D. Cash, get out of his patrol vehicle and walk across the street in the direction of the block party, I decided that it was best to go home, and disengaged from the neighbor I was talking to. As Deputy Cash walked past my location, I asked him "what's going on?" He did not hear my question at first, but stopped; at which point I asked again, "what's going on?" He *politely* replied, "oh I don't know," and continued walking in the direction of the distant block party, later discovered to be at or near 407 Chestnut Street. 407 Chestnut Street is approximately 500 feet from where I was standing at the time.

4.      I walked to the edge of the curb and looked to my left and right to see if cars were coming. I observed a patrol vehicle sitting at the intersection of Mulberry and West Third Streets. It did not have blue flashing lights activated, but anticipating that it would turn towards my direction, I waited a few seconds to accommodate the possibility that the vehicle would turn down the wrong direction. Because the vehicle did not turn in my direction, I began walking across the street; at which point the patrol vehicle's blue lights illuminated, and the vehicle began rapidly accelerating on West Third Street, directly toward me. During this time, I was approaching the middle of the road and got upset, yelling, but not to anyone in particular, "thats stupid what the fuck is his problem," while looking in the direction of the rapidly approaching vehicle. During this time, the white lights from the front and top of the vehicle were flashing, making it difficult to judge how close the vehicle was to me, as it also did not have sirens activated.

5.      As I was crossing the street, I encountered a deputy I later identified as Corporal Nicolas Estes; at which point Corporal Estes asserted to me that "when we have our blue lights on, we expect that right of way." To me this implied that he was dismissing the fact that I was walking across the street when this occurred. I responded "no that's bullshit," and walked over to stand in front of Lieutenant Cash's parked patrol vehicle, where Corporal Estes and I continued the interaction. I was never told to "get out of the street," as I did not know the "street" was at issue. From my perspective, the fact that I was arguing with Corporal Estes was the basis for my arrest. Corporal Estes again offered the excuse of "blue lights" and I told him that I did not "give a fuck." Corporal Estes then threatened me with arrest for "cussing in the street"; I did not curse again, but told him that I would "say what I want to say." Corporal Estes then responded, "no sir" and I immediately turned around and began walking away, while asserting, "yes Imma say what the hell I want to say." As I was walking away from Corporal Estes, he did not give me any commands or directives at that time. In fact, the only commands I was given prior, were to stop cursing and take my "ass up the street." I had stopped cursing when asked, and was reluctantly taking my "ass up the street" 4 seconds after being commanded to; I simply asserted my right to speak freely, while *walking* away as directed by Corporal Estes. I *never* attempted to run from Corporal Estes. The interaction between Corporal Estes and I did not occur in front of a crowd of people. I did not make attempts to incite a crowd of people to violence, as there was no crowd of people around when I was arrested. Furthermore, the actual crowd of people were dealing with their own police presence, approximately 500 feet away from the scene of my arrest.

6.      Corporal Estes, without issuing a warning or command, forcefully grabbed my left arm with both of his hands. This very much startled me at the moment, because the action

was sudden, with *no* verbal indication of an intention to detain or arrest me. After being grabbed without warning, I felt myself come off of the ground and instinctually sprawled out of what I felt was an attempt to slam me on the ground by my arm. At that moment I became really scared and pulled away reflexively, in a frightened panic. I then felt Corporal Estes lose grip and I started to stumble backwards, while trying to catch my balance. I subsequently fell on my back and quickly rose back to my feet. I then stretched my hands out to my side horizontally, and yelled, "what the fuck are you doing get off me" to Corporal Estes, and "what is he doing" to Lieutenant Cash as he rapidly approached. I allowed myself to be tackled by Corporal Estes, and was allowed to stand back up again, after he stopped the aggression. I still did not attempt to run.

7.      As I subsequently got back to my feet again, I was then given the first orders of "put your hands behind your back"; I immediately complied, and was subsequently handcuffed. While being escorted to a patrol vehicle, Corporal Estes told me that he ordered me to "stop cursing in the street." I asserted to him that "I didn't, I said hell." Had Corporal Estes at any time commanded me to "stop, put your hands behind your back," or "you're detained," I would have willingly complied, as I have never resisted an officer's command to put my hands behind my back. I did not try to run from Corporal Estes.

8.      As I was placed into the back seat of Corporal Guy Caine's patrol vehicle, he intentionally cut the vehicle's engine off and lowered the window approximately 2 inches. Upon the door being closed, I yelled multiple times, that I was hot and I had trouble breathing. The temperature outside was in the mid to upper 80s, approximately 87 degrees that night. An unknown deputy looked at me, saying something I understood to be, "well you should have behaved then." I was kept in these conditions for approximately 7 minutes. I put my mouth up to

the 2 inch crack in the window, and still had trouble breathing. I had never experienced this type of punitive behavior from police, prior to this incident.

9. I was then taken to Corporal Estes' patrol vehicle. Corporal Estes deactivated his bodycam as he got into the patrol vehicle to transport Plaintiff. I was transported to Halifax County Jail by Corporal Estes, where I discovered that Corporal Estes told the magistrate that our interaction occurred in front of a large crowd of people.

10. After stepping on a rock during the incident, I thought that my foot might be broken. Two days later I was treated at ECU Health for muscle soreness and mild swelling in my knee, as well as my foot that I found out was *not* broken. I filed a formal complaint with the Sheriff's Office, and that was ignored, hand delivered a letter for Sheriff Davis placing him on direct notice of the constitutional violations and the complaint being ignored. In the letter, I also asked for disclosure of the Bodycam video and went over all applicable laws surrounding bodycam video and its disclosure to individuals that were arrested. This letter was also ignored. To present, I have never had direct communication with Sheriff Davis despite leaving my contact information at the top of the letter. I subsequently filed an AOC 270 form and obtained the bodycam videos through court order.

Executed on this 6th day of January, 2026.

Terrance Johnson II

**UNPUBLISHED**

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

### No. 16-4594

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

BRYAN CHRISTOPHER MARSHALL,

      Defendant - Appellant.

Appeal from the United States District Court for the District of South Carolina, at Columbia. Joseph F. Anderson, Jr., Senior District Judge. (3:15-cr-00630-JFA-1)

Argued: October 26, 2017                 Decided: August 29, 2018

Before GREGORY, Chief Judge, KEENAN, Circuit Judge, and SHEDD, Senior Circuit Judge.

Affirmed by unpublished opinion. Judge Keenan wrote the opinion, in which Chief Judge Gregory and Senior Judge Shedd joined. Chief Judge Gregory wrote a separate concurring opinion.

**ARGUED:** Joshua Snow Kendrick, KENDRICK & LEONARD, P.C., Greenville, South Carolina, for Appellant. William Camden Lewis, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee. **ON BRIEF:** Beth Drake, United States Attorney, Nancy Chastain Wicker, Robert Frank Daley, Jr., Assistant United States Attorneys, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

2

BARBARA MILANO KEENAN, Circuit Judge:

Bryan Marshall was charged with three felonies: (1) possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841; (2) possession of a firearm in connection with a drug trafficking crime, in violation of 18 U.S.C. § 924(c); and (3) being a felon in possession of ammunition, in violation of 18 U.S.C. § 922(g). The charges were based on certain items recovered when police officers executed a search warrant for a vehicle that Marshall was driving immediately before he encountered the police. Marshall sought to suppress this evidence, arguing that the officers had violated his Fourth Amendment rights by arresting him without probable cause, and by towing the vehicle without justification. After the district court denied the suppression motion, Marshall entered a conditional guilty plea. The district court sentenced Marshall in accordance with the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e), and the career offender provision of the United States Sentencing Guidelines, U.S.S.G. § 4B1.1 (the career offender guideline). Marshall now appeals the district court's judgment, challenging the denial of his suppression motion and his ACCA and career offender designations.

Upon our review, we conclude that the district court properly denied Marshall's motion to suppress because (1) his arrest for disorderly conduct was supported by probable cause; and (2) the officers complied with police department policy and acted reasonably in towing the vehicle under the community caretaking exception to the general warrant requirement. We also hold that the court correctly determined that

3

Marshall qualified for enhanced penalties based on his prior drug convictions. We therefore affirm the district court's judgment.

I.

Because the district court denied Marshall's suppression motion, we state the evidence in the light most favorable to the government. *United States v. McGee*, 736 F.3d 263, 269 (4th Cir. 2013). Notably, Marshall does not challenge any of the district court's factual findings, including the district court's decision to credit the testimony of the arresting officer.

On April 22, 2014, around 10:00 p.m., Officer James Heywood and Officer Trainee Christon Miller of the Columbia, South Carolina Police Department, were patrolling a Columbia neighborhood in a marked police car when they received information from a police dispatcher that gunshots had been fired nearby. The dispatcher further informed the officers of a report that a dark-colored pickup truck "with rims" was connected to the shooting incident.

Minutes later, about three or four blocks from the reported shooting, Officer Heywood observed Marshall driving a truck (the truck, or the vehicle) that matched the description provided by the dispatcher. Marshall backed the truck into a driveway of a house located on Waites Road (the Waites Road property), and got out of the truck along with his passengers. Officer Heywood and another officer parked their patrol cars in front of the Waites Road property, got out of their vehicles, and approached Marshall.

4

At that time, Marshall began walking toward the house, and was holding the keys to the truck in his hand. Officer Heywood approached Marshall and inquired about the nearby shooting. Heywood also asked whether the truck had any connection to the shooting incident, and twice requested permission to search the truck.

Marshall admitted that he had been driving the truck, but did not respond to Heywood's requests for consent to search the vehicle. Marshall immediately became loud and belligerent, shouting profanities at the officers and yelling that the officers were "f---ing with him."

During this exchange, between 10 and 15 people came out of the residence, formed a crowd near the officers, and began shouting comments in support of Marshall. After one member of the crowd shouted that the officers would be unable to search the truck if they did not have the keys, Marshall threw the keys into the crowd. The officers did not know where the keys had fallen or whether anyone had retrieved them.

After Marshall continued to disregard the officers' direction to "calm down," the officers arrested him for disorderly conduct, in violation of Columbia City Ordinance 14-91(1). At the time of the arrest, Marshall was standing on public property, on the shoulder of the public street.

Following Marshall's arrest, the officers learned from a computer database that Marshall was not the owner of the truck. The truck was registered to a person who did not reside, and was not currently present, at the Waites Road property. Despite Marshall's request to leave the truck where it was parked, the officers arranged for the truck to be towed to a police station. At the station, a narcotics detection dog alerted to

5

the presence of drugs in the vehicle. The officers later had the truck towed to police department headquarters in Columbia.

The day after Marshall's arrest, narcotics investigators obtained a search warrant for the truck. During a search conducted pursuant to that warrant, investigators recovered from the vehicle several bags of marijuana, hashish, a loaded firearm, additional ammunition, cash, a digital scale, other bags, and a wallet containing Marshall's identification.

After Marshall's entry of a conditional guilty plea reserving his right to appeal the denial of the suppression motion, the district court convicted Marshall of the drug and firearm-related charges.[1] Based on Marshall's four prior drug-related convictions, the probation officer designated Marshall as an armed career criminal under the ACCA and as a career offender under the Guidelines. Over Marshall's objection, the district court concluded that Marshall's prior drug convictions qualified as predicate offenses for purposes of both the ACCA and the career offender guideline. The court sentenced Marshall to a term of 261 months' imprisonment, and Marshall now appeals.

II.

As noted above, in considering the denial of a motion to suppress, we view the evidence in the light most favorable to the government. *McGee*, 736 F.3d at 269. We

---

[1] Local authorities ultimately entered a nolle prosequi on the disorderly conduct charge.

review the district court's factual findings for clear error and its legal conclusions de novo. *Id.*

A.

Marshall first argues that his arrest for disorderly conduct, under Columbia, South Carolina City Ordinance 14-91 (the ordinance), was not supported by probable cause. He contends that his actions did not amount to disorderly conduct, because the crowd did not take any threatening actions and was not so disruptive as to place Marshall's statements outside the scope of First Amendment protection. Notably, however, Marshall does not contend that the ordinance violates the First Amendment, or that his words were not lewd or obscene within the meaning of the ordinance. Instead, he only contests probable cause for his arrest on the limited basis that his actions did not create a clear danger and that, therefore, the district court should have suppressed the evidence recovered from the vehicle following his illegal arrest. We disagree with Marshall's argument.[2]

In addressing the issue whether an arrest was supported by probable cause, we consider two facts: (1) the conduct of the arrestee known to the officer at the time, and (2) the contours of the offense contemplated by that conduct. *Smith v. Munday*, 848 F.3d 248, 253 (4th Cir. 2017). We consider only whether these facts "provide a probability on which reasonable and prudent persons would act," and do not examine the officer's subjective belief regarding whether the probable cause standard was satisfied. *Id.*

---

[2] We emphasize that we express no opinion on the merits of arguments not raised or issues not presented in this appeal.

7

(citation omitted). Thus, although an officer needs more than "bare suspicion" to justify an arrest, the officer need not have evidence sufficient to support a conviction. *Id.* (citation omitted). Probable cause is a practical, common-sense standard that we apply under the totality of the circumstances. *Florida v. Harris*, 568 U.S. 237, 244 (2013).

The ordinance forming the basis for Marshall's arrest provides, in relevant part:

It shall be unlawful for any person within the city limits to engage in the following conduct, *knowing or having reasonable grounds to know that it will tend to promote or provoke a fight, assault or brawl*:

(1) To utter, while in the presence of others, any lewd or obscene epithets or make any lewd or obscene gestures with his hands or body . . . .[3]

Columbia, South Carolina City Ordinance 14-91, *available at* https://library.municode.com/sc/columbia/codes/code_of_ordinances (emphasis added). Because Marshall does not argue that his words were not "lewd or obscene," we consider only whether the officers had probable cause to believe that Marshall engaged in conduct that he reasonably knew would tend to "promote or provoke" violence under the ordinance.

In the present case, in considering the issue of probable cause, we find particularly significant the hostile actions of the assembled crowd. In the absence of the crowd, there would not be a "fair probability," *Harris*, 568 U.S. at 244 (citation omitted), that

---

[3] The government concedes that the officers did not have probable cause to arrest Marshall under subsection (2) of the ordinance, which prohibits the use of "fighting words directed toward another." Columbia, South Carolina City Ordinance 14-91(2). We therefore limit our analysis to subsection (1) of the ordinance.

8

Marshall's use of profanity directed at the police officers would "tend to promote or provoke a fight, assault or brawl," *see* Columbia, South Carolina City Ordinance 14-91. However, when considered in the context of the assembled crowd, Marshall's undisputedly confrontational remarks support the district court's conclusion that Marshall's actions were causing the crowd to become highly agitated. Marshall did not heed the officers' admonition to "calm down" and, in "feeding off" of Marshall's belligerent conduct, the crowd began to mimic Marshall's remarks.[4]

The officers were greatly outnumbered by the shouting crowd. Nevertheless, it was only after Marshall continued his belligerent behavior in front of the crowd, and refused to heed the officers' instructions, that he was placed under arrest. Additionally, we observe that throughout this sequence of events, the officers' public safety concerns were intensified given the report that a shooting had occurred minutes earlier in the immediate vicinity, and that a truck matching the description of the vehicle Marshall was driving had been observed near the shooting scene.

In reviewing these facts and circumstances, we decide only whether it was objectively reasonable for an officer to conclude that Marshall's actions probably violated the ordinance, not whether Marshall's conduct would have supported a conviction for disorderly conduct under a reasonable doubt standard. *See Smith*, 848 F.3d

---

[4] In light of these facts, we disagree with Marshall's contention that, once he declined to speak with Officer Heywood and refused consent to search the vehicle, the officers were obligated to depart the scene. Given the reports of a shooting in the area, Marshall's increasingly belligerent conduct, and the hostility of the crowd, we decline to impose on officers a constitutional obligation to abandon their attempts to secure the safety of a scene involving an agitated crowd.

9

at 253. Officers are not required to be "legal technicians" when evaluating whether a suspect's conduct satisfies the language of an ordinance, particularly when the officer must make that determination in a rapidly deteriorating and potentially dangerous situation. *Harris,* 568 U.S. at 244 (citation omitted); *see also Heien v. North Carolina,* 135 S. Ct. 530, 536-40 (2014) (explaining that the Fourth Amendment gives officers leeway in their assessment of the illegality of a suspect's conduct, given "the reality that an officer may suddenly confront a situation in the field as to which the application of a statute is unclear—however clear it may later become" (internal quotation marks omitted)).

Based on the record before us, we hold that the officers had probable cause to arrest Marshall for disorderly conduct in view of his continuing belligerent behavior and its effect on the escalating conduct of the assembled crowd. The totality of the circumstances supported a common-sense conclusion, in the words of the ordinance, that Marshall had "reasonable grounds to know" that his repeated, confrontational remarks would "tend to promote or provoke a fight, assault, or brawl." *See* Columbia, South Carolina City Ordinance 14-91; *see also Harris,* 568 U.S. at 244 (describing probable cause inquiry as a "practical and common-sensical standard").

## B.

Marshall also argues, however, that the officers violated his Fourth Amendment rights by towing the truck from the Waites Road property following his arrest. Marshall asserts that the officers did not tow the truck under the community caretaking exception

to the warrant requirement, but intended from the outset to search the car for narcotics. We again disagree with Marshall's arguments.

We begin with the familiar proposition that reasonableness is "the ultimate touchstone of the Fourth Amendment" and, accordingly, the general requirement of a warrant supported by probable cause is subject to certain exceptions. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). When police officers are engaged in "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute," the officers may conduct a search or a seizure without probable cause or a warrant (the community caretaking exception). *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973); *United States v. Johnson*, 410 F.3d 137, 143-44 (4th Cir. 2005). Community caretaking functions include, for example, the impoundment of a vehicle that impedes the safe flow of traffic, or entry into a car after a traffic accident to assess occupants' medical conditions. *See South Dakota v. Opperman*, 428 U.S. 364, 368-69 (1976); *Johnson*, 410 F.3d at 141, 145. Applying similar reasoning, this Court has long allowed the warrantless impoundment of a vehicle following the arrest of a driver when "there was no known individual immediately available to take custody of the car, or . . . the car could have constituted a nuisance in the area in which it was parked." *United States v. Brown*, 787 F.2d 929, 932 (4th Cir. 1986).

When, as here, a seizure is conducted consistent with a routine police procedure, we evaluate the "programmatic purpose" of the policy, namely, whether the policy "was animated by community caretaking considerations or by law enforcement concerns." *Hunsberger v. Wood*, 570 F.3d 546, 554 (4th Cir. 2009); *see also Stuart*, 547 U.S. at 405

(explaining that the "programmatic purpose" inquiry is designed to ensure that the rationale underlying the policy or program is distinguishable from general crime control) (citing *City of Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000)); *Cady*, 413 U.S. at 447 (noting that there was "no suggestion in the record that the officers' action in exercising control over [the vehicle] by having it towed away was unwarranted either in terms of state law *or sound police procedure*") (emphasis added). Accordingly, we will uphold a warrantless search or seizure under the community caretaking exception if the officers acted reasonably pursuant to objective criteria stated in a routine police policy that is based on community caretaking concerns. *See Hunsberger*, 570 F.3d at 554; *see also MacDonald v. Town of Eastham*, 745 F.3d 8, 12 (1st Cir. 2014) (explaining that the community caretaking exception is satisfied "so long as the procedure employed (and its implementation) is reasonable" (citation omitted)); *cf. Opperman*, 428 U.S. at 374-75 (explaining that compliance with standard police procedures in conducting an inventory search "tend[s] to ensure that the intrusion [will] be limited in scope to the extent necessary to carry out the caretaking function").

Here, it is undisputed that during the period of time that the vehicle remained on the Waites Road property, the officers lacked probable cause to search the vehicle and had not obtained a warrant. *See generally Collins v. Virginia*, 138 S. Ct. 1663 (2018). We therefore turn to consider whether the officers properly towed the vehicle under the community caretaking exception to the warrant requirement. *See Johnson*, 410 F.3d at 143-44.

12

At the outset, we emphasize that, unlike many cases involving an arrest from and an impoundment of a vehicle, the officers in the present case did not at any time conduct an inventory search of the truck. Instead, they towed the vehicle to a secure location and only conducted a search after obtaining a search warrant supported by probable cause. Accordingly, because Marshall does not challenge the search itself, we limit our analysis of the community caretaking exception to the officers' decision to tow the vehicle, based on the circumstances reasonably known to them at the time.

In evaluating the legality of the officers' decision to tow the truck, we consider: (1) whether the department policy authorizing the tow is based on community caretaking or criminal investigation considerations; and (2) whether the officers complied with the policy. *See Hunsberger*, 570 F.3d at 554; *see also Stuart*, 547 U.S. at 405 (explaining "programmatic purpose" inquiry). Our resolution of these factors permits us to answer the ultimate question whether the officers' decision to tow the vehicle was a reasonable exercise of a police community caretaking function. *See generally Cady*, 413 U.S. at 441-47.

The officers towed Marshall's vehicle pursuant to Columbia Police Department Policy, Section 6, Chapter 5, § 7.2 (the department policy, or the policy), which provides, in relevant part:

Vehicles Taken Into Police Custody

Departmental personnel may also tow the following vehicles:

> • Any vehicle from which an officer makes an arrest and there is no responsible party to whom the arrestee can turn over the possession of the vehicle (§ 56-5-2520 S.C. Code) . . . .

The department policy imposes three requirements before an officer may authorize the tow of a vehicle: "(1) the officer makes the arrest from the vehicle, (2) the arrest occurs away from the arrestee's residence, and (3) the owner is not present at the scene and no other person is present who is authorized to take responsibility for the vehicle." *State v. Miller*, 814 S.E.2d 166, 170 (S.C. 2018). The policy authorizes tows that meet these requirements irrespective whether the vehicle is located on public or private property.[5] *See id.* at 169-70, 172-73.

The South Carolina Supreme Court has explained that the provisions of this particular department policy limit officers' discretion to tow vehicles, and "are precisely the sort of 'standardized criteria' courts have consistently looked to in determining whether the seizure and towing of a vehicle is reasonable under the Fourth Amendment." *Id.* at 171 (citations omitted). We agree, and similarly conclude that the department policy on its face is rooted in community caretaking considerations.

By ensuring that a vehicle driven by an arrestee is not left unsecured, the department policy protects that property against theft or damage, protects the arresting officers from claims related to such theft or damage, and prevents the vehicle from becoming a nuisance if abandoned at the scene of the arrest. All these considerations are

---

[5] Marshall's contention that South Carolina law prohibits towing vehicles from private property is foreclosed by the South Carolina Supreme Court's decision in *Miller*. The court in *Miller* held that the *same* police department policy at issue here was authorized by and did not conflict with South Carolina law. *Miller*, 814 S.E.2d at 172-73. Moreover, the court in *Miller* also held that the South Carolina Code does not preclude officers from towing cars located on private property. *Id.* at 169, 172-73.

14

legitimate community caretaking concerns regardless whether the vehicle is located on public or private property. *See United States v. Coccia*, 446 F.3d 233, 240-41 (1st Cir. 2006) (approving tow of vehicle from private driveway of doctor's office for community caretaking purposes, including to ensure "the safekeeping of the vehicle, which was packed with [the defendant's] personal belongings"); *cf. Opperman*, 428 U.S. at 369 (explaining community caretaking functions that justify inventory searches of vehicles following impoundment); *Hunsberger*, 570 F.3d at 553-54 (explaining that courts have applied the community caretaking exception to searches of private homes, but declining to apply the rationale in that particular case).

Here, the officers' decision to tow the truck complied with the strict requirements of the department's towing policy, a policy that reflected community caretaking concerns. First, although the officers did not effectuate a traffic stop of the truck Marshall was driving, the officers followed Marshall in that vehicle, watched him park and alight from the vehicle, and arrested him minutes later. The South Carolina Supreme Court evaluated markedly similar circumstances in *Miller*, and held that the officers had effected an arrest "from" the vehicle in question in accordance with the department policy, despite the fact that the officers had not initiated a traffic stop. *See Miller*, 814 S.E.2d at 168, 170-71; *see also id.* at 175-76 (Beatty, C.J., dissenting). In light of the South Carolina court's holding, we are satisfied in the present case that the vehicle was one "from which" Marshall was arrested as required by the department policy.

Second, it is undisputed that Marshall did not reside at the Waites Road property, and that the owner of the vehicle neither resided nor was present at the scene. The

15

officers did not act to have the vehicle towed until after confirming that (1) Marshall was not the registered owner of the vehicle; (2) Marshall did not reside at the Waites Road property; (3) the vehicle was not registered to a person who resided at the Waites Road property; (4) the vehicle's owner was not present at the scene; and (5) no one else came forward claiming to be a responsible party with authority to take possession of the vehicle.[6] Under these circumstances, the officers reasonably concluded that "no responsible party to whom the arrestee can turn over the possession of the vehicle" was present, within the meaning of the department policy. *See id.* at 168, 170-71 (concluding that the department policy was satisfied when the defendant was arrested away from his residence and the owner of the vehicle was not present at the scene).

We also observe that, before his arrest, Marshall already had relinquished control over the truck by throwing its keys to an unknown location in the crowd, whose members were becoming increasingly agitated. By this volitional act, Marshall left the vehicle unsecured. Given these circumstances, the officers reasonably could infer that the vehicle might be the subject of theft, vandalism, or other damage if left unsecured on the premises in the absence of a responsible custodian. *See Coccia*, 446 F.3d at 240

---

[6] We decline Marshall's invitation to impose on officers an obligation to conduct a more exhaustive investigation of potential custodians for a vehicle following an arrest. The South Carolina Supreme Court has not read such a requirement into the department policy. *See Miller*, 814 S.E.2d at 177-78 (Beatty, C.J., dissenting) (criticizing majority's decision to uphold a tow under the policy, despite fact that officer did not "check to determine if there was a responsible party" present). This type of mandate would be particularly inappropriate in this case, when the officers were attempting to deescalate a deteriorating safety situation during which the other individuals at the scene were acting in an agitated and hostile fashion.

(explaining officers acted reasonably pursuant to community caretaking exception when there was a risk of theft or vandalism of the arrestee's property); *compare Miranda v. City of Cornelius*, 429 F.3d 858, 866 (9th Cir. 2005) ("An officer cannot reasonably order an impoundment in situations where the location of the vehicle does not create any need for the police to protect the vehicle or to avoid a hazard to other drivers."). After Marshall surrendered control over the vehicle, the officers were faced with the choice either of transporting the absent owner's property to a secure location or of leaving the vehicle unsecured and potentially vulnerable to criminal activity. The officers were not obligated to use the least intrusive means possible to effectuate their community caretaking responsibilities, *see Johnson*, 410 F.3d at 146, and, therefore, reasonably decided to tow the vehicle to a secure location.

After examining the totality of the circumstances, we are left with the firm belief that the officers acted reasonably throughout their encounter with Marshall. *See Opperman*, 428 U.S. at 375 ("Whether a search and seizure is unreasonable within the meaning of the Fourth Amendment depends upon the facts and circumstances of each case . . . .") (citation omitted). The officers did not initiate a traffic stop, but instead began a consensual encounter after Marshall voluntarily got out of the truck. The officers effectuated an arrest supported by probable cause based exclusively on Marshall's belligerent conduct during the interaction, which occurred in the presence of an increasingly agitated crowd. After confirming that Marshall was not the owner of the truck and did not reside at the Waites Road property, the officers towed the vehicle consistent with a community caretaking policy that significantly limited the officers'

17

discretion. And the officers did not conduct an inventory search of the vehicle, but instead waited to obtain a search warrant supported by probable cause, the legitimacy of which Marshall does not challenge. Additionally, despite Marshall's unsupported speculation to the contrary, the record is devoid of evidence that the officers acted in bad faith or towed the vehicle in order to search for narcotics.[7] We therefore conclude that the officers acted reasonably in executing the towing policy.

In sum, we hold that the record supports the district court's determination that the officers acted reasonably in towing the absent owner's vehicle. Because the officers' actions were within the scope of the community caretaking exception to the general warrant requirement, we affirm the district court's denial of Marshall's motion to suppress.

### III.

Marshall next challenges the district court's determination that his four prior drug convictions qualify as predicate offenses for purposes of the ACCA and the career offender guideline. He contends that because the South Carolina statutes under which he was convicted prohibit the mere "purchase" of controlled substances, his convictions do not categorically qualify as "serious drug offenses" under the ACCA or "controlled

---

[7] Marshall does not challenge the officers' decision to employ a narcotics detection dog after the vehicle had been towed to the police station. We nevertheless observe that, after the vehicle lawfully was in police custody, the officers were entitled to use the narcotics detection dog on the exterior of the car without a warrant. *See generally Illinois v. Caballes*, 543 U.S. 405, 409 (2005).

18

substance offenses" under the career offender guideline. Marshall also argues that we should not apply the modified categorical approach in our analysis, because the statutes under which he was convicted are not "divisible" as defined by the Supreme Court. We disagree with Marshall's arguments.

We review de novo the question whether a state crime qualifies as a predicate offense under the ACCA and the career offender guideline. *United States v. Burns-Johnson*, 864 F.3d 313, 315 (4th Cir. 2017). The ACCA defines the term "serious drug offense" as

> an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance . . . , for which a maximum term of imprisonment of ten years or more is prescribed by law.[8]

18 U.S.C. § 924(e)(2)(A)(ii).

Generally, we apply the categorical approach to determine whether a prior conviction qualifies as a predicate offense for purposes of the ACCA. *United States v. Dozier*, 848 F.3d 180, 183 (4th Cir. 2017). The categorical approach requires us to consider only whether "the elements of the prior offense . . . correspond in substance to the elements of the enumerated offense," irrespective of the actual facts underlying the

---

[8] Similarly, a predicate "controlled substance offense" under the career offender guideline is defined as an offense punishable by more than one year of imprisonment "that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense." U.S.S.G. § 4B1.2(b). Because the ACCA and the career offender guideline both require more than mere possession or purchase of a controlled substance, we will address the two definitions together for purposes of this opinion. *See* 18 U.S.C. § 924(e)(2)(A)(ii); U.S.S.G. § 4B1.2(b).

19

defendant's conviction. *Id.* (citation, internal quotation marks, brackets, and alteration omitted); *see also Mathis v. United States*, 136 S. Ct. 2243, 2257 (2016) ("Courts must ask whether the crime of conviction is the same as, or narrower than, the relevant generic offense," and not whether the defendant's conduct satisfies the generic definition.).

When a state statute is "divisible," however, we apply the modified categorical approach, which enables us to compare the elements of the state and federal generic offenses. *Mathis*, 136 S. Ct. at 2249. A statute is divisible if it "list[s] elements in the alternative, and thereby define[s] multiple crimes." *Id.* In contrast, a statute is not divisible if it "enumerates various factual means of committing a single element," rather than "lists multiple elements disjunctively." *Id.* at 2249, 2257. Elements of an offense, as opposed to means of commission, are "factual circumstances of the offense" that "the jury must find unanimously and beyond a reasonable doubt." *Omargharib v. Holder*, 775 F.3d 192, 198 (4th Cir. 2014) (citation and internal quotation marks omitted).

If a statute is divisible, a court first must determine which crime forms the basis of the defendant's conviction. *Mathis*, 136 S. Ct. at 2249. Thus, under the modified categorical approach, a court may consider a "limited class of documents" approved by the Supreme Court to determine the elements of the particular crime of which the defendant was convicted. *Id.* (citing *Shepard v. United States*, 544 U.S. 13, 26 (2005)). A court then is required to compare those elements with the federal definitions of "serious drug offense" and "controlled substance offense." *See id.* at 2249, 2256.

In the present case, Marshall was convicted of three counts of possession with intent to distribute marijuana within proximity of a school, in violation of South Carolina

Code § 44-53-445, and one count of possession with intent to distribute marijuana, in violation of South Carolina Code § 44-53-370. Section 44-53-370(a)(1) provides that it is unlawful for a person

> to manufacture, distribute, dispense, deliver, purchase, aid, abet, attempt, or conspire to manufacture, distribute, dispense, deliver, or purchase, or possess with the intent to manufacture, distribute, dispense, deliver, or purchase a controlled substance or a controlled substance analogue.

Section 44-53-445 adds the additional element of engaging in a drug offense within a certain proximity of a school or public park (collectively, the South Carolina statutes, or the statutes). *See State v. Watts*, 467 S.E.2d 272, 278 (S.C. Ct. App. 1996).

The South Carolina statutes on their face govern a broader range of conduct than the ACCA or the career offender guideline by prohibiting the mere "purchase" of narcotics. Accordingly, if the statutes were indivisible, the state offenses would not categorically satisfy the definition of "serious drug offense" in the ACCA or "controlled substance offense" in the career offender guideline. However, we conclude that the statutes do not list alternative means of committing a single crime, but instead set forth alternative elements constituting separate crimes. The statutes therefore are divisible, and are subject to the modified categorical approach. *See United States v. Cabrera-Umanzor*, 728 F.3d 347, 352 (4th Cir. 2013).

In reaching this conclusion, we consider how South Carolina prosecutors charge the offenses, the elements on which South Carolina juries are instructed, and the manner in which South Carolina courts treat convictions under these statutes. *See Mathis*, 136 S. Ct. at 2256-57; *Descamps v. United States*, 570 U.S. 254, 272 (2013) ("A prosecutor

charging a violation of a divisible statute must generally select the relevant element from its list of alternatives," and the jury must find that element unanimously and beyond a reasonable doubt.). Courts in South Carolina treat the purchase of a controlled substance as a distinct crime from possession with intent to distribute under Section 44-53-370. *State v. Watson*, 2013 WL 8538756, at *2 (S.C. Ct. App. 2013) (upholding indictment and jury form listing purchase and possession with intent to distribute separately); *see also United States v. Rodriguez-Negrete*, 772 F.3d 221, 226-27 (5th Cir. 2014) (applying modified categorical approach to conviction under S.C. Code § 44-53-370); *cf. United States v. Maroquin-Bran*, 587 F.3d 214, 218 (4th Cir. 2009) (holding that modified categorical approach applied to question whether defendant was convicted of "sale" or "transportation" of marijuana under California law for purposes of "drug trafficking" enhancement under U.S.S.G. § 2L1.2(b)(1)(A) (2008)). South Carolina prosecutors also charge one of the listed statutory alternatives in state court indictments. *See, e.g.*, *Carter v. State*, 495 S.E.2d 773, 776-77 (S.C. 1998) (stating that indictment is captioned "Manufacturing Methamphetamine 44-53-370," and that "the plain language of the body of the indictment clearly notifies [the defendant] that he is charged with manufacturing methamphetamine"). And South Carolina juries typically are instructed to find one of the alternative elements listed in the statute beyond a reasonable doubt. *See, e.g.*, *State v. Gill*, 584 S.E.2d 432, 435 (S.C. Ct. App. 2003) (listing elements for "distribution of crack cocaine") (citing *Watts*, 467 S.E.2d at 278, and *Brown v. State*, 540 S.E.2d 846 (S.C. 2001)). For these reasons, we conclude that South Carolina Code §§ 44-53-370 and 445

set forth alternative elements, and that, therefore, the statutes are subject to review under the modified categorical approach.

In applying the modified categorical approach, we may examine certain state court documents, including the indictment, the terms of a plea agreement or plea colloquy, or a "comparable judicial record of this information," such as a sentencing sheet from the South Carolina courts, to determine which alternative offense formed the basis for Marshall's conviction. *United States v. Montes-Flores*, 736 F.3d 357, 365 (4th Cir. 2013) (quoting *Shepard*, 544 U.S. at 26); *United States v. Bethea*, 603 F.3d 254, 259 (4th Cir. 2010) (consulting South Carolina "sentencing sheets" under modified categorical approach); *see also Rodriguez-Negrete*, 772 F.3d at 227 (same). The sentencing sheets for Marshall's predicate offenses clearly indicate that Marshall was convicted of possession with intent to distribute marijuana, or possession with intent to distribute marijuana within proximity of a school or park, not of purchasing a controlled substance. *See Mathis*, 136 S. Ct. at 2253-54 (explaining that modified categorical approach may be used to determine which elements formed the basis for a defendant's conviction, not to examine the underlying facts of the case). Because the South Carolina offense of possession with intent to distribute corresponds directly with the ACCA definition of a "serious drug offense," namely, "possessing with intent to . . . distribute, a controlled substance," 18 U.S.C. § 924(e)(2)(A)(ii), we conclude that Marshall's prior drug convictions qualify as predicate offenses under the ACCA.

For the same reasons, we hold that the South Carolina offense of possession with intent to distribute also matches the definition of a "controlled substance offense" under

the career offender guideline. *See* U.S.S.G. § 4B1.2(b) (defining "controlled substance offense" in part as "possession of a controlled substance . . . with intent to manufacture, import, export, distribute, or dispense"). The district court therefore properly sentenced Marshall pursuant to the ACCA and the career offender guideline.

IV.

For these reasons, we affirm Marshall's conviction and the sentence imposed by the district court.

*AFFIRMED*

GREGORY, Chief Judge, concurring:

I write separately only to highlight certain troubling aspects of this litigation, both at the trial level and before this Court.

At the trial level, the plea negotiations took an inexplicable course. After initially charging Marshall with three drug and firearms offenses, the government offered Marshall a plea to just one count (possession of marijuana with intent to distribute), with a recommended sentence of eight years, on the condition that Marshall not proceed with his suppression hearing. S.J.A. 46–48. Marshall declined and proceeded with the suppression motion, which he lost. The government then offered ten years—and later nine years—again for the single marijuana charge. For some unknown reason, Marshall turned down that last offer of *one* count for *nine* years and instead pleaded guilty to all *three* counts, including two non-marijuana charges that carried a combined mandatory minimum of *twenty* years. J.A. 148–49, 171–72.

The extreme difference between those terms of incarceration indicates that neither Marshall nor his counsel was aware that the two additional counts carried mandatory minimums. Indeed, at the plea hearing, the district court confirmed with Marshall that neither the court, nor Marshall, nor the government was then aware of what sentencing statutes and guidelines were applicable, how the recommended sentence would be calculated under the applicable laws, and what the court would ultimately impose. *See* S.J.A. 48. Marshall and his counsel must have, misguidedly, thought that the sentencing judge could have shown mercy and sentenced Marshall to less than nine years. As a result, Marshall seemingly decided to take his chances, but due to the overlooked

25

mandatory minimums, the judge sentenced him to nearly twenty-two years. And now, this father of two teenage daughters stands to spend behind bars more than twice the amount of time than even the prosecution thought necessary.

Adding insult to injury, Marshall's conviction and sentence flowed from what may well have been an unlawful arrest that counsel failed to adequately contest. Imagine you are in Marshall's position. On an otherwise uneventful April evening, you borrow your sister's truck to go to your friend's house for a cookout. You park the truck in your friend's driveway. When you step out of the truck, you notice that your friends are on the porch and start heading towards them. Suddenly, several police officers arrive at the house. Seemingly out of the blue, they stop you and start questioning you about reported gunshots in the neighborhood. They immediately demand to search your sister's truck. And, like any innocent bystander might reasonably do, you become irritated at being treated like a suspect from the outset. You refuse to let them search the car, but the officers continue to single you out. They continue to question you, demanding to search the car, and you become frustrated because you think you are being treated unfairly. You tell the police that they are "fucking with you"—that it's "bullshit" that you are being targeted while simply trying to attend a friend's cookout. Your friends, watching from a distance, start criticizing the police, too. You try to end the discussion about the truck by throwing the car keys to your friend hosting the cookout. The officers then arrest you on the ground that you uttered "lewd or obscene" speech that tends to promote violence. Columbia, South Carolina City Ordinance 14-91 (specifying various forms of disorderly conduct, including obscene utterances).

26

The disorderly conduct ordinance's prohibition against "lewd or obscene" expressions that "tend to promote or provoke" violence has two necessary elements that appear to correspond to two narrow exceptions to First Amendment protection. The first is obscenity. *Miller v. California*, 413 U.S. 15, 24 (1973). The second is "incitement to imminent lawless action." *Brandenburg v. Ohio*, 395 U.S. 444, 449 (1969). Marshall failed to raise the former and cited the wrong standard for the latter.

Before this Court, Marshall never even attempted to argue that his arrest, and the resulting seizure of his car, was unlawful on the ground that his speech was neither "lewd" nor "obscene." Whether or not his speech was lewd or obscene implicates both a necessary element of the alleged offense and a fundamental First Amendment doctrine— both of which impact the reasonableness of the arrest but neither of which was raised by Marshall. Indeed, at oral argument, defense counsel himself did not seem to know the definition of obscenity. When asked by the Court whether police officers should reasonably be expected to know the definition of obscenity when making arrests, counsel cited the outdated clear-and-present danger standard, which, apart from no longer being good law, has nothing to do with obscenity.* Oral Arg. at 38:50–40:30. That response missed the real nub of the probable cause analysis—the distinction between obscenity and the mere use of expletives. Using the latter as a means of criticizing law enforcement

---

* The Supreme Court first articulated the clear-and-present danger test in *Schenck v. United States*. *See* 249 U.S. 47, 52 (1919) (rejecting anti-draft advocates' First Amendment defense against violation of Espionage Act because speech was sufficiently likely to hinder war effort). However, the Supreme Court has since replaced that test with the incitement-to-imminent-lawlessness standard. *E.g.*, *Hess v. Indiana*, 414 U.S. 105, 108 (1973); *Brandenburg*, 395 U.S. at 449.

is clearly protected First Amendment activity and cannot constitute probable cause for an arrest under the terms of the local ordinance. *See City of Houston, Tex. v. Hill*, 482 U.S. 451, 461 (1987) ("[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."); *Lewis v. City of New Orleans*, 415 U.S. 130, 132, 134 (1974) (invalidating state statute that forbid cursing at police officers); *Cohen v. California*, 403 U.S. 15, 25 (1971) ("[O]ne man's vulgarity is another's lyric.").

On the other hand, as the Supreme Court has clearly established since nearly a half-century ago, obscenity has a particular and narrow meaning in the speech context. Specifically, it refers to expressions that, "taken as a whole, appeal to the prurient interest in sex, [] portray sexual conduct in a patently offensive way, and [], taken as a whole, do not have serious literary, artistic, political, or scientific value." *Miller*, 413 U.S. at 24. By definition, criticism of police and other governmental practices cannot be devoid of serious political value. *See Cohen*, 403 U.S. at 26 ("[O]ne of the prerogatives of American citizenship is the right to criticize public men and measures—and that means not only informed and responsible criticism but the freedom to speak foolishly and without moderation." (citation omitted)). Nor did his speech even remotely appeal to the prurient interest. Marshall's speech therefore falls squarely outside the scope of the obscenity exception to First Amendment protection and as the government rightfully concedes, no other speech exception, such as fighting words, is even arguably applicable. *See id.* at 16, 19–21 (holding that state could not prohibit "Fuck the Draft" message because expression was neither erotic nor fighting words nor likely to provoke violence). Therefore, Marshall's speech is clearly entitled to First Amendment protection on the

28

ground that it is not obscene. Yet, Marshall failed to raise the obscenity issue even tangentially.

While Marshall did argue that his words did not promote violence, the other element of the disorderly conduct ordinance, he then failed to argue the applicable imminent lawlessness standard, which is more protective than the outdated clear-and-present danger test that Marshall did invoke. In typical cases involving speech and crowd unrest, the dispute involves drawing a fine line between advocacy, which is protected, and incitement, which is not. *See, e.g.*, *Hess v. Indiana*, 414 U.S. 105, 108–09 (1973) (holding that advocacy of illegal action at some indefinite future time did not amount to incitement); *Brandenburg*, 395 U.S. at 449 & n.4 (striking down statute that prohibited advocacy or teaching of violence as means of achieving political reform). This case is far from that gray area. Marshall's comments to the police were merely descriptive and did not urge any action by his friends—his speech therefore fell well-short of even advocacy, let alone the higher bar of incitement. Moreover, even assuming that Marshall implicitly encouraged the crowd to join his verbal protest, such protest alone does not amount to imminent lawlessness. As Officer Heywood testified, the cookout guests, though loud and disrespectful, never made threatening remarks or movements and never got closer than 30–45 feet away. Nor did Marshall encourage any of the guests to do more. For the officers to have arrested Marshall under such circumstances clearly exceeds the state's limited authority to prohibit speech likely to incite imminent lawlessness. If citizens are vulnerable to arrest simply for criticizing the government in the presence of others, then our civil liberties may as well not exist.

29

Laws regulating pure speech, such as obscenity and disorderly conduct statutes, must be carefully and narrowly circumscribed to avoid chilling First Amendment rights. *See Miller*, 413 U.S. at 23–24 ("We acknowledge . . . the inherent dangers of undertaking to regulate any form of expression. State statutes designed to regulate obscene materials must be carefully limited."); *see also Hess*, 414 U.S. at 107 ("Indiana's disorderly conduct statute was applied in this case to punish only spoken words . . . . [T]he constitutional guarantees of freedom of speech forbid the States to punish the use of words or language not within narrowly limited classes of speech." (citation and alterations omitted)). Therefore, when police officers enforce laws that may infringe on protected activity under the First Amendment, the citizen's First Amendment rights must inform the reasonableness of the arrest under the Fourth Amendment. *See Sause v. Bauer*, 138 S. Ct. 2561, 2562–63 (2018). Indeed, the Supreme Court has indicated that courts should guard against the risk that "some police officers may exploit the arrest power as a means of suppressing speech." *See Lozman v. City of Riviera Beach, Fla.*, 138 S. Ct. 1945, 1953 (2018).

Here, had Marshall properly raised the issue, clearly established First Amendment principles concerning obscenity and incitement would have informed the reasonableness of Marshall's arrest under the Fourth Amendment. Stated simply, police officers do not have probable cause to arrest individuals for engaging in conduct that the state clearly has no authority to prohibit. *See Leonard v. Robinson*, 477 F.3d 347, 359–361 (6th Cir. 2007) (holding that arrest was not supported by probable cause because state clearly could not prohibit speaker from using expletives in political speech); *Brendle v. City of*

30

*Houston, Miss.*, 177 F. Supp. 2d 553, 559 (N.D. Miss. 2001) (holding that arrest was unlawful because statute prohibiting profanity was clearly unconstitutional). And here, the constitutional protections surrounding Marshall's use of expletives could not have been clearer.

In sum, if a citizen were arrested for engaging in protected speech that the government clearly could not (or did not) criminalize, then the officer could not have reasonably believed that the citizen engaged in illegal activity, and there could not have been probable cause for that arrest. However, Marshall failed to even argue that his criticism of police activity, albeit crude and irreverent, was not obscenity, whether as understood under the First Amendment or as proscribed by the local ordinance. Nor did Marshall argue that the officers lacked probable cause by arresting him for protected speech that clearly fell short of incitement. Because Marshall has failed to raise these potentially dispositive issues, I concur in the majority opinion.